## LEARNING DISABILITIES ASSOCIATION OF MARYLAND, INC., et al., Plaintiffs,

v.

## The BOARD OF EDUCATION OF BALTIMORE COUNTY, et al., Defendants.

### Civ. A. No. HAR 93–2154.

United States District Court, D. Maryland.

Oct. 19, 1993.

---

Beth Goodman, Tanya Harvey, Feldesman, Tucker, Leifer, Fidell & Bank, Washington, DC, for plaintiffs.

Leslie R. Stellman, Littler, Mendelson, Fastiff, Tichy & Mathiason, Jo Ann Goedert, Office of Atty. Gen., Educational Affairs Div., Baltimore, MD, for defendants.

## MEMORANDUM OPINION

. HARGROVE, District Judge.

The parents of five children with learning disabilities,[1] along with three non-profit organizations,[2] initiated the above-captioned ac-

---

1. John and Lore Bradshaw on behalf of themselves and their son, Alexander, Mary and Hal Miller on behalf of themselves and their son, Michael, Stuart and Leslye Solomon on behalf of themselves and their daughter, Andrea, Nancy Johnson, on behalf of herself and her son, Melvin, and Patricia and Robert Utz, on behalf of themselves and their daughter, Holly, were initially named as Plaintiffs.

On or about July 27, 1993, the Utzes' concerns about their daughter's placement for the upcoming school year were resolved informally and to their satisfaction. Consequently, on or about August 10, 1993, the Plaintiffs filed their first amended complaint, dropping the Utzes as plaintiffs, but adding Lois and Timothy Herty, on behalf of themselves and their son John, and

Nancy Rees, on behalf of herself and her daughter, Patricia.

2. The Learning Disabilities Association of Maryland ("LDA") is a non-profit organization consisting of approximately 1100 members, the majority of whom are parents of children with learning disabilities. Approximately 200 of LDA's members reside in Baltimore County and are members of the Learning Disabilities Association of Metropolitan Baltimore ("Local LDA"). Both the LDA and Local LDA, on behalf of their members, are named Plaintiffs.

The Teachers' Association of Baltimore County ("TABCO"), which purports to represent teachers employed in Baltimore County Schools, is also a named Plaintiff. TABCO claims to "bring

tion alleging that the Board of Education of Baltimore County, Maryland violated the Individuals with Disabilities Education Act, ("IDEA"), 20 U.S.C. §§ 1400, *et seq.* in deciding to transfer for the 1993–1994 academic year approximately 350 students from separate special education centers and self-contained special education classrooms to regular education settings. Seeking to maintain 1992–1993 special education placements, on August 10, 1993, just eighteen (18) working days before the 1993–1994 academic year was to commence, the Plaintiffs filed a Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction urging the Court, among other things, to enjoin Baltimore County from effectuating the transfers. Two days later, Judge Alexander Harvey, II, sitting as Chambers Judge, after lengthy oral argument, declined to issue the TRO; he expressly left Plaintiffs' Motion for Preliminary Injunction and Defendants' Motions[3] to Dismiss for this Court to resolve.[4]

The Court has reviewed the record, the transcript of Judge Harvey's oral opinion, the parties' respective memoranda and the exhibits attached thereto; no hearing is deemed necessary. Local Rule 105(6) (D.Md.1992). For purposes of resolving the instant motion to dismiss, the Court deems all material allegations made in the Com-

plaint to be true, and construes all facts, and all reasonable inferences drawn therefrom, in the light most favorable to the Plaintiffs. *Jenkins v. McKeithen,* 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). For the reasons articulated more fully herein, Plaintiffs' claims will be dismissed.

### I. *Legal Framework*

Originally enacted in 1975 as the Education of the Handicapped Act ("EHA"),[5] the IDEA embodies Congress' response to the more than four million "handicapped" children in the United States who were not receiving appropriate public educations. "The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education and providing financial assistance to enable states to meet their educational needs." *Hoeft v. Tucson Unified School Dist.,* 967 F.2d 1298, 1300 (9th Cir.1992). The IDEA reflects Congress' recognition of and respect for the unique pedagogical needs of children with disabilities as well as the legitimate concerns of their parents.[6] With teachers and school district representatives, parents participate in a process of designing a "free appropriate public education"[7] tailored to meet the

this action on behalf of its member teachers who have been prevented by Defendants from expressing their professional opinions regarding the level of services and types of placements necessary for their individual students with disabilities." (Second Amended Complaint ¶ 2).

3. The Plaintiffs' complaint names as Defendants (1) the Board of Education of Baltimore County, (2) its Superintendent, Stuart Berger, and (3) its Director of the Office of Special Education, Marjorie Rofel, (collectively, the "BCPS Defendants"); it also names as Defendants (4) the Maryland State Department of Education, (5) its Superintendent, Nancy Grasmick, and (6) its Assistant Superintendent for Special Education, Richard Steinke, (collectively, the "MSDE Defendants"). Both the BCPS and the MSDE Defendants submitted Motions to Dismiss.

4. Since Judge Harvey's ruling, the Plaintiffs have revised their request for injunctive relief, filed a Motion for Leave to File a Second Amended Complaint, and submitted a Motion for Class Certification. The Court will grant the Plaintiffs leave to amend; however, in light of its decision to dismiss the complaint, the Court need not

reach Plaintiffs' Motion for a Preliminary Injunction or for Class Certification.

5. Effective October 30, 1990, Congress changed the name of the EHA, renaming the Act the IDEA.

6. "It is the purpose of this chapter to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of children with disabilities and their parents or guardians are protected, to assist States and localities to provide for the education of all children with disabilities, and to assess and assure the effectiveness of efforts to education children with disabilities." 20 U.S.C. § 1400(c).

7. The IDEA, in pertinent part, defines a "free appropriate public education" as:

Special education and related services that (A) have been provided at public expense, under public supervision and direction, without charge, ... and (D) are provided in conformity

unique academic needs of their child. This process culminates with the development of an "Individual Education Program" ("IEP").

The IEP sets out the child's present educational performance, establishes annual and short term objectives for improvement in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives. The IEP must be reviewed, and, where necessary, revised at least once a year in order to ensure that local agencies tailor the statutorily required "free appropriate public education to each child's unique needs." 20 U.S.C. § 1414(a)(5).

*Barnett v. Fairfax County School Bd.*, 927 F.2d 146, 150 (4th Cir.1991). In *Board of Education v. Rowley*, the Supreme Court emphasized the importance of ensuring meaningful parental participation in formulating and implementing a child's IEP:

It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with the procedures giving parents and guardians a large measure of participation at every stage of the administrative process ... as it did upon the measurement of the resulting IEP against a substantive standard.

458 U.S. 176, 205–206, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982).

In addition to championing the individual rights of children with disabilities and their parents, the IDEA articulates anti-discriminatory principles which transcend the case-by-case examination of an appropriate curriculum for each disabled child. The IDEA requires public school systems receiving federal funds, "to the maximum extent appropriate," to educate children with disabilities in regular classrooms with children who are not disabled. Required to place students with disabilities in "the least restrictive environment," 34 C.F.R. § 300.552(d), public school systems are cautioned "that special classes, separate schooling or other removal of chil-

dren with disabilities from the regular educational environment [should] occur only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(B). "Mainstreaming of handicapped children into regular school programs where they might have opportunities to study and to socialize with non-handicapped children is not only a laudable goal but is also a requirement of the Act." *Barnett, supra* 927 F.2d at 153, *citing DeVries v. Fairfax County School Bd.*, 882 F.2d 876, 878 (4th Cir. 1989).

## II. *Factual Framework*

The inherent tension created by IDEA's mandate to mainstream children with disabilities while simultaneously considering their individual concerns provides the legal context for the instant dispute. In 1991, the United States Department of Education's Office of Civil Rights ("OCR") investigated allegations that the Baltimore County Public Schools ("BCPS") systematically deprived students with disabilities from an education in the least restrictive environment by segregating such students in special education centers and classrooms. An OCR compliance review issued in November 1992 confirmed that there were students in special schools in Baltimore County who should be placed in regular schools. In response, BCPS decided that during the 1993–1994 academic year, approximately 375 students from five (5) special education centers would be mainstreamed.[8] BCPS contacted the parents or guardians of the children slated for transfer in "early Spring 1993," (Second Amended Complaint ¶ 37), and in mid-June 1993, "parents were notified of [new] school assignments for their children." (August 12, 1993 Oral Opinion of J. Harvey at 8.16–18). On July 23, 1993, without submitting their concerns to the Baltimore County Board of Education or to the Maryland State Department

with the individualized education program required under section 1414(a)(5) of this title. 20 U.S.C. § 1401(18).

8. "BCPS announced that 69 out of 93 students at White Oak; 150 of 376 students at Chatsworth; 55 of 203 students at Eastwood/Battle Monu-

ment; 50 out of 220 students at Ridge/Ruxton; and 50 out of 250 students at Rolling Road School would be dispersed to a variety of different placements for the 1993–1994 academic year." (Second Amended Complaint ¶ 31).

of Education, the Plaintiffs filed a complaint in this federal court.

In broad-brushed, conclusory fashion, the Plaintiffs contend that "BCPS has embarked on a sweeping program of wholesale dismantling of the special education centers ... thus depriving Plaintiffs of their statutory right to a full continuum of alternative placements, including special schools." (Second Amended Complaint ¶¶ 30, 35). According to the Plaintiffs,

> [BCPS'] action evidences an administrative decision that, as a general proposition, students with learning disabilities no longer are entitled to the types of programs and levels of services provided to them in special education centers and previously determined through the IDEA process to be required to meet those students' individual needs.

(Second Amended Complaint ¶ 32). Specifically, the Plaintiffs claim that BCPS mainstreamed children with disabilities in violation of the procedural safeguards which the IDEA guarantees.[9]

### III. Discussion

The IDEA contains an elaborate scheme of procedural requirements designed to protect parents' rights to participate meaningfully in all decisions affecting their child's special education. Under the IDEA, parents must receive "written prior notice ... whenever [a state educational] agency proposes to initiate or change, or refuses to initiate or change, the identification, evaluation or educational placement of [their] child." 20 U.S.C. § 1415(b)(1)(C). This notice must contain an explanation of the reasons behind the decision, 34 C.F.R. § 300.505, and must fully inform parents of the procedural safeguards available to them, 20 U.S.C. § 1415(b)(1)(D), including their right to "present complaints with respect to any matter relating to the identification, evaluation or educational placement of [their] child." 20 U.S.C. § 1415(b)(1)(E).

The preliminary forum for complaints of IDEA violations is an "impartial due process hearing" conducted by the local school district or by the state. 20 U.S.C. § 1415(b)(2). This hearing must be held, and a final decision must be reached, not later than 45 days after the public agency receives a request for the hearing. 34 C.F.R. § 300.512. During an administrative hearing, the IDEA grants complainants

> (1) the right to be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities, (2) the right to present evidence and confront, cross-examine, and compel the attendance of witnesses, (3) the right to a written electronic verbatim record of such hearing, and (4) the right to written findings of fact and decisions.

20 U.S.C. § 1415(d). If the local school district conducts the initial hearing, persons dissatisfied with its conclusion may appeal to the state level. 20 U.S.C. § 1415(c); "any party aggrieved by the [State's] findings and decision shall have the right to bring a civil action with respect to the complaint ... in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(e)(2). Furthermore,

---

9. Plaintiffs make the following allegations:

a. BCPS changed the educational placement of students with disabilities without parental or teacher participation. (Second Amended Complaint ¶¶ 30, 38, 59).

b. Children with disabilities have been transferred without prior re-evaluation supporting such changes. (Second Amended Complaint ¶¶ 30, 38, 43, 50, 59).

c. Changes to children with disabilities' IEPs have been made without proper notice to parents. (Second Amended Complaint ¶¶ 30, 38, 42, 59).

d. BCPS has not provided parents with specific information concerning proposed placements and the services to be provided to their children there. (Second Amended Complaint ¶¶ 52, 59).

e. BCPS has told parents that if they agree to have their children moved out of special education centers for the upcoming year, they will have some choice in the proposed placements, whereas if they insist on keeping their children in the centers for the 1993–94 school year, they will not be given choices for the 1994–95 school year. (Second Amended Complaint ¶ 50).

f. BCPS directed teachers not to communicate with parents concerning their children's needs. (Second Amended Complaint ¶¶ 38, 59).

during the pendency any proceedings conducted pursuant to this section, ... the child shall remain in the then current educational placement of such child ... until all such proceedings have been completed.

20 U.S.C. § 1415(e)(3).[10]

"The philosophy of the [IDEA] is that a plaintiff must first exhaust the state administrative remedies provided under the Act, including the administrative appeals provisions, before bringing an action in federal court." *Cox v. Jenkins*, 878 F.2d 414, 418–19 (D.C.Cir.1989) (citations omitted).[11] "The exhaustion of administrative remedies doctrine has long been held to mean that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Christopher W., supra* 877 F.2d at 1093–94.

The exhaustion doctrine embodies the notion that agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer. The IDEA's exhaustion requirement also recognizes the traditionally strong state and local interest in education, as reflected in the statute's emphasis on state and local responsibility.... Exhaustion of the administrative process allows for the exercise of discretion and educational expertise by state and local agencies, affords full exploration of technical educational issues, furthers development of a complete factual record and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children.

*Hoeft, supra* 967 F.2d at 1303. The exhaustion requirement also "prevents the parties from undermining the agency by deliberately flouting the administrative process." *Cox v. Jenkins, supra* 878 F.2d at 419. *See also Crocker v. Tennessee Secondary School Athletic Ass'n*, 873 F.2d 933 (6th Cir.1989); *Association for Retarded Citizens, Inc. v. Teague*, 830 F.2d 158 (11th Cir.1987).

■ IDEA's exhaustion requirement, however, is not without its narrow exceptions. When enacting IDEA's statutory precursor, both the House of Representatives[12] and the Senate[13] recognized that there are situations in which exhaustion serves no useful purpose. For example, parents need not exhaust IDEA's administrative remedies where the state or local agency's procedures would be

---

**10.** In addition to IDEA's procedural safeguards, federal regulations also provide an administrative mechanism for ensuring state and local compliance with federally funded education programs. The Education Division General Administration Regulations (EDGAR), 34 C.F.R. §§ 76.1–76.910, require states to adopt a formal procedure for receiving and resolving complaints that the state or local education agency is violating the IDEA or its regulations. 34 C.F.R. § 76.-780. A complainant dissatisfied with the state's disposition may request review of the state decision by the U.S. Secretary of Education, 34 C.F.R. § 76.781(c), who is authorized to withhold federal funding from a state found to be in non-compliance with the IDEA. 20 U.S.C. § 1416.

**11.** "EDGAR provides an administrative mechanism for assuring that a state complies with state-administered federal programs, including the [IDEA]. EDGAR is to be distinguished from the specific administrative complaint procedures detailed in the [IDEA] itself." *Christopher W. v. Portsmouth School Committee*, 877 F.2d 1089, 1091 n. 2. (1st Cir.1989). The Plaintiffs were not required to exhaust the administrative remedies outlined in EDGAR before initiating their com-

plaint under the IDEA. "It would be contrary to Plaintiffs' interests to petition for the withholding of federal funds.... Plaintiffs want [state special] education programs implemented, not dismantled." *Mrs. W. v. Tirozzi*, 832 F.2d 748, 758 (2nd Cir.1987).

**12.** "There are certain situations in which it is not appropriate to require the use of due process and review procedures ... before filing suit. These include complaints that: (1) it would be futile to use the due process procedures; (2) an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law; (3) it is improbable that adequate relief can be obtained by pursuing administrative remedies (e.g., the hearing officer lacks the authority to grant the relief sought)." H.R.Rep. No. 296, 99th Cong., 1st Sess. 7 (1985).

**13.** "Exhaustion of administrative procedures established under this part should not be required for any individual complainant filing a judicial action in cases where such exhaustion would be futile either as a legal or practical matter." Senator Williams' remarks, 121 Cong.Rec. 37416 (1975).

inadequate[14] or futile.[15] Moreover, when their complaint challenges "generally applicable policies that are 'contrary to law' ... or when exhaustion will work severe harm upon a litigant," *Christopher W., supra* 877 F.2d at 1092, parents' exhaustion of IDEA's administrative remedies may be excused. "In determining whether these exceptions apply, [the Court examines] whether the pursuit of administrative remedies under the facts of a given case will further the general purposes of exhaustion and the congressional intent behind the administrative scheme." *Hoeft, supra* 967 F.2d at 1302–1303 (citations omitted).

■ "The burden of demonstrating that administrative procedures [should be excused] falls on the party seeking to avoid them." *Crocker, supra* 873 F.2d at 937, *citing Honig v. Doe,* 484 U.S. 305, 327, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988). Contrary to Plaintiffs' suggestion, "application of IDEA's statutory exhaustion requirement, and the exceptions to it, is predominantly a question of law," *Hoeft, supra* 967 F.2d at 1303, (citations omitted), and the Court is not required to find that Plaintiffs are entitled to an exemption simply because they so state in their complaint. *But see Mrs. W. v. Tirozzi, supra* 832 F.2d at 757, ("Accepting the facts as pleaded by plaintiffs as true and drawing all inferences in their favor, plaintiffs have pleaded an entitlement to an exemption from exhaustion of administrative remedies sufficient to overcome a motion for judgment on the pleadings."). Instead, Plaintiffs must allege facts that, if proven, would support one of the narrow exceptions to IDEA's exhaustion requirement; "they cannot rely on conclusory statements that the available administrative remedies denied them due process because they were a 'sham' or 'incapable of resolving the issues.'" *Christopher W., supra* 877 F.2d at 1095, *citing Association for*

*Retarded Citizens, Inc., supra* 830 F.2d at 162.

■ The Plaintiffs pepper their complaint with allegations purporting to justify their decision to bypass IDEA's administrative remedies and to proceed directly to federal court. Their primary assertion—and the one they impressed most vociferously on Judge Harvey—is that

> even if some relief may be available to some individual parents through the administrative hearing process, such relief cannot practicably be provided in advance of the upcoming school year as the administrative procedures under federal and state law allow BCPS 45 days to conduct a hearing and provide a local level hearing decision to parents.

(Second Amended Complaint ¶ 57). As a factual matter, if this argument ever carried persuasive weight, it no longer does. School has already started, many special education students have already been mainstreamed, and disruption of the current placements, if such disruption is ultimately deemed warranted, can await the completion of an administrative review. Moreover, in light of BCPS's prompt resolution of the Utzes' concerns, *see supra* note 1, it was not necessarily the case on July 23, 1993 that parents could not secure relief in advance of the school year.

Moreover, as a matter of law, Plaintiffs' claim that they could not obtain administrative relief in advance of the 1993–1994 school year also lacks merit. Had the Plaintiffs' initiated a timely administrative complaint, BCPS would have been legally obligated to grant, at least temporarily, the precise relief Plaintiffs seek, namely the maintenance of 1992–1993 special education placements. 20 U.S.C. § 1415(e)(3).[16] The Plaintiffs chose

---

14. "Administrative remedies are generally inadequate where structural, systemic reforms are sought.... Exhaustion may also be excused because of inadequacy of administrative remedies where the plaintiffs' substantive claims themselves concern the adequacy of the administrative process." *Hoeft, supra* 967 F.2d at 1309.

15. Exhaustion may be deemed futile "where the state agency itself prevented administrative remedies from being exhausted." *Christopher W., supra* 877 F.2d at 1092.

16. Had BCPS proceeded to mainstream students despite the pendency of an administrative claim, Plaintiffs' futility argument would have been more persuasive. Similarly, Plaintiffs' allegation that "Defendants BCPS, Berger and Rofel have further stated that they will pursue their plan without regard to the complaints of individual parents through administrative proceedings under the IDEA," (Second Amended Complaint ¶ 36), may have supported direct judicial inter-

not to file their claims until late July 1993 despite having notice of the transfers perhaps in "early Spring," and certainly no later than "mid-June." Assuming *arguendo* that the IDEA's administrative remedies would not have yielded the relief they seek by the beginning of the 1993–1994 school year, the Plaintiffs delay effectively short-circuited the administrative procedures' efficacy. "Though the need for swift action which administrative procedures cannot provide may justify an exception to the exhaustion requirement, no exception will be made where plaintiffs assert an emergency that is in fact a problem of their own making." *Crocker, supra* 873 F.2d at 937 (citations omitted).

Alternatively, Plaintiffs seek to avoid IDEA's exhaustion criteria by contending that BCPS is dismantling the special education centers and categorical, self-contained classes: "since the end result of the IDEA process may well be that the students should remain in those placements, exhaustion of administrative remedies has been rendered futile by Defendants' continued pursuit of this plan." (Second Amended Complaint ¶ 36). Judge Harvey convincingly dispensed with this argument, finding that

> [i]t does not appear that there has been a complete dismantling of the Special Education Centers. According to the Plaintiffs, some 374 of the students are being dispensed to different placement locations for the 1993–1994 academic year. But these numbers leave some 768 students who are remaining at all of these Centers except apparently for Eastwood. This hardly amounts to a complete dismantling.

(August 12, 1993 Oral Opinion of J. Harvey at 11.20–12.3).

Plaintiffs also argue that the "administrative hearing officers do not have the authority to enjoin the type of wholesale movement of students and teachers and elimination of existing special education programs currently being implemented by BCPS." (Second Amended Complaint ¶ 57). Not only do Plaintiffs' claims of "wholesale movement," in light of Judge Harvey's findings, appear overblown, but, as noted above, the IDEA does grant hearing officers the authority to enjoin the transfer of students, at least during the pendency of an administrative proceeding. 20 U.S.C. § 1415(e)(3). Thus, the IDEA's administrative process was adequately equipped to address and resolve the Plaintiffs' concerns, and had "the potential for producing the very result Plaintiffs seek, namely, statutory compliance." *Hoeft, supra* 967 F.2d at 1309.

■ Perhaps Plaintiffs' most compelling justification for circumnavigating administrative avenues is that their allegations arguably raise pure questions of law. Agency expertise and the development of an administrative record are therefore, theoretically unnecessary in assisting the Court's resolution of Plaintiffs' claims.[17] However, "structuring a complaint as a challenge to policies, rather than as a challenge to an individualized education program formulated pursuant to those policies, does not suffice to establish entitlement to a waiver of the IDEA's exhaustion requirement. Plaintiffs must demonstrate in addition that the underlying purposes of exhaustion would not be furthered by enforcing the requirement." *Id.* at 1304.

While it may be true that determining whether BCPS' notification of parents concerning the mainstreaming of their children complied with the IDEA does not require an expertise in education administration, the Court must consider the importance of affording an agency an opportunity to consider and correct its errors. "Even where local school policies appear on their face to violate the IDEA, administrative exhaustion may be necessary to give the state a reasonable opportunity to investigate and correct such policies." *Id.* at 1307. "The states as well as the federal government have an interest in

---

vention had it been stated after the fact rather than in speculative anticipation.

**17.** Whether BCPS complied with IDEA's notice requirements is not necessarily a conundrum devoid of factual analysis. This Court does not believe that the expertise and experience of state and local educational agencies would be irrele-

vant in determining whether particular notices provided to parents comply with the IDEA. "Even if [BCPS] had committed multiple procedural violations, the hearing officer is still in a better position to make that determination." *Cox v. Jenkins, supra* 878 F.2d at 421.

providing a means whereby official abuse can be corrected without resort to lengthy and costly trial. Resort to administrative processes is a desirable alternative to litigation in the federal courts." *Cox v. Jenkins, supra* 878 F.2d at 421, (citations omitted). *See also Smith v. Robinson,* 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984) ("States are given the power to place themselves in compliance with the law, and the incentive to develop a regular system for fairly resolving conflicts under the IDEA."). As Judge Harvey noted, "if as argued, the defendants have violated procedural requirements of the IDEA and the ADA, including their failure to give proper written notice to parents, these deficiencies can and should be addressed in appropriate administrative proceedings." (August 12, 1993 Oral Opinion of J. Harvey at 12.17–21).[18]

### *Conclusion*

Despite its decision to dismiss the instant matter, this Court realizes that mainstreaming is not appropriate for every child with disabilities. "Placement of [disabled] children in special programs located in public schools is not necessarily evidence of discrimination under either the [IDEA] or the Rehabilitation Act. Section 1412(5) of the [IDEA] expressly recognizes that, in appropriate circumstances, [disabled] children may be placed in segregated programs." *DeVries v. Fairfax County School Bd., supra* 882 F.2d at 880.

> The proper inquiry is whether a proposed placement is appropriate under the Act.... Framing the issue in this manner accords the proper respect for the strong preference in favor of mainstreaming while still realizing the possibility that some handicapped children simply must be educated in segregated facilities either because any marginal benefits received from mainstreaming are far outweighed by the

benefits gained from services which could not feasibly be provided in the non-segregated setting, or because the handicapped child is a disruptive force in the non-segregated setting.

*Roncker on behalf of Roncker v. Walter,* 700 F.2d 1058, 1063 (6th Cir.) *cert. denied,* 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983).

The Plaintiff-parents may very well have meritorious claims concerning BCPS' substantive compliance with the IDEA;[19] the Court intends in no way to intimate its opinion concerning an appropriate educational placement for the children whom BCPS transferred. Moreover, the Court voices no opinion concerning BCPS' compliance with IDEA's procedural requirements. The Plaintiffs' failure to exhaust IDEA's administrative remedies renders inappropriate, and therefore unnecessary, this Court's resolution of any of their claims concerning BCPS's compliance with the Act. Consequently, their complaint will be dismissed.

In accordance with this Memorandum Opinion, it will be so ordered.

### *ORDER*

This eighteenth (18th) day of October, 1993, it IS, by the United States District Court for the District of Maryland, hereby ORDERED:

1. That Plaintiffs' Motion for Leave to File Second Amended Complaint BE, and the same hereby IS, GRANTED;

2. That the BCPS Defendants' Motion to Dismiss BE, and the same hereby IS, GRANTED;

3. That the Clerk of the Court CLOSE this case.

---

**18.** Given the great lengths to which they go attempting to excuse their failure to exhaust administrative channels of relief, the Plaintiffs cannot credibly contend that BCPS' notice was so deficient as to prevent them from knowing about an administrative forum. "Rather, it appears that the plaintiffs' failure to pursue administrative remedies was entirely voluntary." *Hoeft, supra* 967 F.2d at 1305.

**19.** The Court need not express an opinion concerning LDA's or TABCO's representational standing. Moreover, it does not reach the legal question of whether TABCO, assuming it has standing, can invoke the IDEA or whether it must seek refuge in another source of employment law.