INDEPENDENT SCHOOL DISTRICT
NO. 283, ST. LOUIS PARK,
MINNESOTA, Plaintiff,

v.

S.D., By and Through her parents, J.D. and N.D.; J.D. and N.D.; Minnesota Commissioner of Education Linda Powell; Past Minnesota Commissioner of Education Gene Mammenga; Acting Commissioner of Education Robert Wedl; and K.S., Hearing Review Officer, Defendants,

and

K.M., By and Through his parents, J.M. and M.M., Movant for Intervention.

Civil No. 3–93–SC–662.

United States District Court,
D. Minnesota,
Third Division.

May 16, 1995.

Susan E. Torgerson, Charles E. Long, St. Paul, MN, for Ind. Sch. Dist. No. 283.

Sonya D. Kerr, St. Paul, MN, Dee Alpert, New York City, for S.D., J.D. and N.D.

Bernard E. Johnson, Stephen B. Liss, Asst. Minnesota Attys. Gen., St. Paul, MN, for Linda Powell, Gene Mammenga, and Robert Wedl.

Lewis A. Remele, Jr., Minneapolis, MN, for K.S.

Margaret O'Sullivan Kane, St. Paul, MN, for Movant.

## ORDER

KYLE, District Judge.

This matter came before the Court on the parties' various motions and was referred to United States Magistrate Judge Raymond Erickson for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Currently before the Court are Defendant S.D.'s Objections to his March 13, 1995 Order and Report and Recommendation ("R & R").

A district court must make an independent determination of those portions of a report and recommendation to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

■ The R & R in this matter is exhaustive, thorough, well-reasoned and exemplary. After independently reviewing the files, records, and proceeding herein, together with the memoranda provided by the parties, the Court concurs with the reasoning and conclusions reached by the Magistrate Judge and will not reiterate those reasons in response to S.D.'s Objections. The Court will note, however, that S.D.'s contention that the record was not sufficiently developed to permit the Magistrate Judge to grant summary judgment on several claims alleged in S.D.'s counterclaim and cross-claim misconstrues the nature of the Magistrate Judge's decision. Having reviewed the hearing transcript regarding this issue and the R & R, the Court is satisfied that the Magistrate Judge correctly applied principles of collateral estoppel to S.D.'s claims in concluding that "no viable claim can exist ... in the absence of a claim which, factually and legally, is distinct from those that have already been resolved." (R & R at 58–59.) Based upon that conclusion, dismissal of S.D.'s counterclaims and cross-claims is appropriate.

Based on the foregoing, the Court **ADOPTS** the March 13, 1995 Report and Recommendation (Doc. No. 81) and **IT IS ORDERED**[1] that:

(1) Plaintiff's Motion for Judgment on the Record (Doc. No. 14) is **GRANTED;**

(2) Defendant Commissioners' Motion to Dismiss (Doc. No. 6) is **GRANTED;**

(3) Defendant K.S.'s Motion to Dismiss (Doc. No. 13) is **GRANTED;**

(4) Defendant Commissioners' Motion to Dismiss S.D.'s Cross–Claim (Doc. No. 21) is **DENIED AS MOOT;**

---

1. The issue of the amount of attorneys' fees to which Defendant S.D. may be entitled is currently before the Magistrate Judge and will be the subject of a report and recommendation to the undersigned.

(5) Plaintiff's Motion to Dismiss S.D.'s Counterclaims (Doc. No. 29) is **GRANTED;** and

(6) Defendant Commissioners' Motion to Dismiss the Amended Cross–Claim (Doc. No. 39) is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

### ORDER and REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

At Duluth, in the District of Minnesota, this 13th day of March, 1995.

#### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A) and (B), upon a cavalcade of Motions by the various parties. Of these Motions, our analysis has been largely preoccupied by two: 1) The Motion by S.D., and her parents, for leave to present additional evidence;[1] and, 2) the Plaintiff's Motion for Judgment on the Record. Given our recommended disposition of the Motion for Judgment on the Record, our discussion of the remaining Motions will be somewhat truncated.

A Hearing on the first wave of the parties' Motions was conducted on March 18, 1994, at which time the Plaintiff Independent School District No. 283 ("School District") appeared by Susan E. Torgerson and Charles E. Long,

Esqs.; the Defendants S.D., J.D. and N.D. (at times, collectively referred to as "S.D.") appeared by Sonya D. Kerr and Dee Alpert, Esqs.; the Defendants Linda Powell, Gene Mammenga and Robert Wedl ("the Defendant Commissioners") appeared by Bernard E. Johnson, Assistant Minnesota Attorney General; and the Defendant K.S. appeared by Lewis A. Remele, Jr., Esq. Thereafter, a Hearing on K.M.'s Motion to Intervene was conducted on May 26, 1994, at which time the Movant appeared by Margaret O'Sullivan Kane, Esq., and Stephen B. Liss, Assistant Minnesota Attorney General, made an additional appearance on behalf of the Defendant Commissioners.

During the pendency of these Motions, our ability to responsibly consider the parties' arguments was effectively precluded by the absence of a complete and verified Administrative Record. Accordingly, after informal attempts to secure such a Record proved ineffectual, we instructed the parties, by Order dated April 14, 1994, to confer and to agree upon a verified Record, or to submit any contested portions of the Record for our resolution. Thereafter, on June 14, 1994, this Court directed that the Certified Inventory, which had been submitted by the Defendant Commissioners and which constitutes the Administrative Record in this matter, be filed with the Clerk of Court. Upon that filing, the Administrative Record in this matter was provisionally closed, making the present Motions ready for decision.[2]

For reasons which follow, we deny S.D.'s Motion to augment the Record, and we

---

**1.** No formal Motion to supplement the Record has been filed by S.D., but we interpret her suggestion, that was expressed at the time of the Hearing in this matter, as representing an interest to expand the Record on review. Accordingly, we treat the issue as if a formal Motion had been filed.

**2.** As ultimately certified, the Administrative Record in this matter is comprised of thousands of documents, it includes nearly 2,000 pages of Hearing transcript alone, and it consumes fully three feet of file space. To say the least, our informed and comprehensive review of this Record has been a herculean task. Given its depth and expanse, the process of thoroughly canvassing this Record has been both incremental and repetitious, as a result of the Court's attention

being repeatedly and unavoidably drawn to other exigent matters. As a consequence, we wholeheartedly concur in the Supreme Court's repeated characterization of these administrative and judicial review proceedings as being "often ponderous." *Honig v. Doe,* 484 U.S. 305, 322, 108 S.Ct. 592, 603, 98 L.Ed.2d 686 (1988); *Burlington School Comm. v. Mass. Dept. of Ed.,* 471 U.S. 359, 370, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985); *Hendrick Hudson Dist. Bd. of Ed. v. Rowley,* 458 U.S. 176, 186 n. 9, 102 S.Ct. 3034, 3040 n. 9, 73 L.Ed.2d 690 (1982) ("Judicial review invariably takes more than nine months to complete, not to mention the time consumed during the preceding state administrative hearings").

recommend that the School District's Motion for Judgment on the Record be granted. As a consequence, we further recommend that the District's Motion to dismiss the Counterclaims of S.D. be granted, that the Motion to Intervene be denied, and that S.D.'s Motion for Attorney's fees be granted.[3]

## II. *Procedural and Factual Background*

■ A. *Procedural Posture.* Consistent with our obligations under the Individuals with Disabilities Education Act, Title 20 U.S.C. § 1400, *et seq.* ("IDEA"),[4] we have independently and painstakingly reviewed the Administrative Record, and have accorded such weight to the factual findings of the Administrative Officers below as is warranted by the circumstances. *Hendrick Hudson Dist. Bd. of Ed. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982) (Section 1415(e) of the IDEA carries implied requirement that "due weight" be given to the underlying administrative proceedings).

**3.** Our Recommendation renders certain of the other Motions moot, including the Motions to Dismiss of the Hearing Review Officer ("HRO") and of the Defendant Commissioners. In addition, the Motion to Intervene should be denied, since the commonality of the factual and legal issues—which was tenuously scant before—is now entirely absent. Moreover, the issues under the IDEA are fact-driven, and do not lend themselves well to consolidation. See, *Lenn v. Portland School Committee,* 998 F.2d 1083, 1087 (1st Cir.1993) ("Determining the adequacy of an IEP is a fact-intensive exercise."). Moreover, we expressly find that the intervention being requested would ineluctably and unduly delay the resolution of the matter, thereby prejudicing the interests of all of the parties. Therefore, we deny the Motion to Intervene.

**4.** Prior to amendments in 1990, see, *Pub.L. No. 101–476, § 901(a)(1),* 104 Stat. 1103, 1142 (1990), the IDEA was known as the Education of All Handicapped Children Act ("EHA" or "EAHCA"). For consistency and convenience, in the course of this Opinion we will address these statutes under the common label of the "IDEA."

**5.** Although espousing a "substantial evidence" standard of review, we find that the HRO accorded appreciably less deference to the Hearing Officer's ("HO's") factual determinations than would be consonant with the substantial evidence test. On repeated occasion, the HRO tempered a factual finding of the HO by noting testimony that, in the HRO's judgment, conflicted with the HO's factual determination. Such a practice, however, is distinctly at odds with the

Here, in accordance with Minnesota law, two levels of administrative review were completed. See, *Minnesota Statutes Sections 120.17, Subdivision 3b(a) and 120.17, Subdivision 3b(g).*

■ At the first level of the administrative process, a Hearing Officer ("HO"), who was appointed by the Minnesota Commissioner of Education, heard twelve days of testimony and concluded that the School District properly provided S.D. with a "free appropriate public education," as required by the IDEA. See, *Title 20 U.S.C. § 1401(a)(18).* Subsequently, a Hearing Review Officer ("HRO"), who was also appointed by Minnesota's Commissioner of Education, conducted an administrative review, considered additional evidence, and reversed the decision of the HO. While, in large measure, the factual findings of the HO were adopted by the HRO, some differences have emerged in the findings that each drew from a common Record.[5] Given these layers of

general rule that, where an inference drawn by an administrative factfinder is within a "zone of choices," then that determination may not be rejected on review unless it is unsupported by substantial evidence on the record as a whole. See, *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) ("the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Robinson v. Sullivan,* 956 F.2d 836, 838 (8th Cir.1992) ("if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, we must affirm the decision."). Notably, the HRO failed to detail any such basis for her rejection of the HO's factual findings.

Of course, in embracing the substantial evidence standard, the HRO erred since a "preponderance of the evidence" test is specified by the Individuals with Disabilities Education Act ("IDEA"). See, *Title 20 U.S.C. § 1415(e)(2).* While it could be argued that this weight of the evidence standard should only apply to a reviewing Court, we find such a construction to be illogical. It would make no sense for a reviewing Court to exercise a greater degree of discretion in drawing its factual findings than the Administrative Officers who presided over the gathering, the initial appraisal, and the resultant review of that evidence during the proceedings below. Viewed indulgently, it appears that the HRO reweighed the evidence—as would be appropriate were she conducting a *de novo* review, which she was not—and misidentified her stan-

administrative processing, we wish to make clear that, on matters of fact, we have afforded greater weight to the factfindings of the HO in view of his opportunity to observe the demeanor of the witnesses and to render believability determinations.[6] *Doyle v. Arlington County School Bd.*, 953 F.2d 100, 104 (4th Cir.1991) (Court adopts factual findings of administrative officer who physically heard witness' testimony in preference to those of administrative review officer); *Combs v. School Board of Rockingham County*, 15 F.3d 357, 361 (4th Cir.1994); and cf., *Delaware County Intermediate Unit #25 v. Martin K.*, 831 F.Supp. 1206, 1220 n. 17 (E.D.Pa.1993). As a consequence, based upon our thorough assessment of the entire Record before us, we expressly adopt the factual findings of the HO as amply supported by the preponderance of the evidence.

*Petersen v. Hastings Public Schools*, 31 F.3d 705, 707 (8th Cir.1994). However, in order to furnish a succinctly stated factual context for the discussion which follows, we briefly summarize the Administrative Record before us.

B. *Factual Background.* S.D., who was born on March 24, 1983, suffers from a condition of severe dyslexia[7]—an impairment which has had a grave impact upon her ability to perform in the classroom and, particularly, in areas that involve reading and mathematics. S.D. entered the kindergarten in the 1988–89 school year at Peter Hobart Primary Center, which is one of the elementary educational facilities that is located in the School District. S.D. did not request or receive any special education services during that school year, although her kindergarten teacher did notice that she was having difficulty in letter recognition.[8]

---

dard of scrutiny as one of "substantial evidence." We find her error of misidentity vastly overshadowed, however, by the HRO's failure to afford any weight to the HO's exclusive opportunity to judge the demeanor and the credibility of the witnesses. As a result, we find the HRO's summary explanation of the result she reached quite problematic:

> I cannot agree with the Hearing Officer that a child with average to high average intelligence who cannot read, write or do mathematics upon entering the fourth grade has received educational benefit. For this reason, I have reversed the Hearing Officer.

In order to draw such inferences from this Record, the HRO would have had to reject, in total, the testimony of each of S.D.'s instructors at the School District—a prospect that is untenable. We are mindful that the HRO took exception to the use of the term "mastered" by several of S.D.'s instructors, but we find the HO's accreditation of that testimony convincing. Accordingly, as so justified, the HRO's reversal of the HO can rise to little more than an artful expression of hyperbole.

6. In so doing, we particularly note the deference which is extended to the factfinding capabilities of a Trial Court, even when its factfinding has been restricted to the consideration of physical or documentary evidence. See, *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (deferential "clearly erroneous" standard applies even when the findings of the Trial Court "do not rest on credibility determinations but are based instead on physical or documentary evidence or inferences from other facts."). Notwithstanding that our "major role is the determination of fact," we would not presume to substitute our appraisal of a witness' believability for that reached by the initial finder-of-fact who held the

unique position of being able to physically assess the witness' testimony. *Id.* at 574, 105 S.Ct. at 1511. Absent a compelling showing—which here has not been made—we would not extend such deference to the factual findings of the HRO, who was in no better position to examine this paper record on review, than the one that we have held.

Of course, on matters of substantive educational policy, we have accorded the HRO's findings a deferential standing so as to assure that we are not, inadvertently, substituting "our notions of sound educational policy for those of the school authorities" which we are reviewing. *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, supra at 206, 102 S.Ct. at 3050; and see also, *Town of Burlington v. Dept. of Educ., Comm. of Mass.*, 736 F.2d 773, 792 (1st Cir.1984), aff'd sub nom. *Burlington School Comm. v. Mass. Dept. of Ed.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *Petersen v. Hastings Public Schools*, 31 F.3d 705, 707 (8th Cir.1994) (Scope of appellate review "is, in reality, quite narrow."). Here, however, the HRO's decision was not pinioned upon educational policies which were at odds with those expressed and applied by the HO.

7. Dyslexia is a familial disorder in which an individual's ability to read, spell and write words is impaired, notwithstanding the individual's ability to see and recognize letters. *Dorland's Illustrated Medical Dictionary*, at p. 518 (27th Ed.1988).

8. According to the testimony of Bonnie Carlson ("Carlson"), who was the Supervisor of Special Education at the School District, during the times pertinent to S.D.'s attendance in the first grade, the Minnesota Department of Education's position on learning disabilities was that children

During the period from 1989 through 1992, S.D. continued to attend regular education classes for her first, second and third grades at Peter Hobart. In each of these grades, her classes were divided into student groupings that remained together from year-to-year as a result of the school's participation in a program called VITAL. There was also a continuity in the teaching teams for these classes, and S.D.'s classroom instructor, during these three years, was Paula Keenan ("Keenan").[9]

Shortly after S.D. started in the first grade, Keenan and the other teachers in the VITAL program noted that S.D. was experiencing difficulty in her reading assignments. In an effort to remedy these difficulties, peer tutors and adult volunteers were asked to work directly with S.D. in her classroom instruction. Later, however, in November of 1989, Keenan initiated discussions concerning an initial special education assessment for S.D., which was conducted with the approval of S.D.'s parents. This assessment disclosed that S.D. was above average in her verbal and performance intelligence, but that there were notable discrepancies in her mathematical computations,[10] and in her listening comprehension, written expression, and reading skills. Based upon this assessment, an Individualized Education Program ("IEP")[11] was developed on February 14, 1990.

Under that IEP, S.D. continued in her regular classes for the remainder of her first grade year, and she received additional, special education services, on a weekly basis, under the direction of Barbara Goldberg ("Goldberg"), who served as S.D.'s first grade special education teacher. In addition to holding a Master's Degree in Elementary Education and being licensed in teaching children who have learning disabilities, remedial reading and emotionally and behaviorally dysfunctional children, Goldberg has had 28 years of experience in teaching special edu-

in kindergarten and the first semester of the first grade were not to be assessed. S.D. takes exception to this evidence, but Carlson's testimony was not controverted. Nonetheless, we agree with the HRO that the School District has an obligation to provide "regular education, special education or both to a pupil or regular education student in kindergarten through grade 12." *Minnesota Rules 3525.2325, Subpart 1*. On this Record, however, it is not clear whether S.D. had an "identifiable * * * mental condition" in the years prior to and including the kindergarten. *Minnesota Statutes Section 120.03, Subdivision 1*. Accordingly, while we agree with the HRO that an assessment for special education purposes should have been conducted by the District prior to the second semester of the first grade, we are unable to determine whether the absence of that assessment had any impact upon the appropriateness of S.D.'s public education at the time that she elected to transfer to Groves or otherwise qualified her for "compensatory educational services." *Miener By and Through Miener v. State of Mo.*, 800 F.2d 749, 754 (8th Cir.1986).

9. Keenan, who was formerly known as Paula Hoff, graduated from the University of Minnesota in 1985, with a Bachelor of Science degree in education. Subsequently, she returned to the University as a graduate student, where she enrolled in courses which focused upon reading for primary age students. She had taught in the multiage classroom for five years and, prior to that time, had taught kindergarten for three years.

Keenan taught S.D. during her first, second and third grade years—through June of 1992—and, if S.D. and her parents would have had their way, Keenan would have been S.D.'s teacher in the Spring of 1993.

10. The evidence reveals that the discrepancy reported in the areas of computational and applied mathematics were regarded by S.D.'s evaluators as being anomalous since the assessment device was not testing what S.D. and her classmates were learning in the classroom. Nevertheless, S.D. was prescribed a regimen of assistance in mathematics as a result of the noted discrepancies in math.

11. An IEP "sets out the child's present educational performance, establishes annual and short term objectives for improvement in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Evans v. District No. 17 of Douglas County, Nebraska*, 841 F.2d 824, 827 n. 1 (8th Cir.1988). The IEP "must be reviewed, and, where necessary, revised at least once a year in order to ensure that local agencies tailor the statutorily required free appropriate public education to each child's unique needs." *Learning Disabilities Association v. Board of Education of Baltimore County*, 837 F.Supp. 717, 720 (D.Md.1993), quoting *Barnett v. Fairfax County School Bd.*, 927 F.2d 146, 150 (4th Cir.1991). In short, the IEP is the *"modus operandi"* of the IDEA. *Burlington School Comm. v. Mass. Dept. of Ed.*, supra at 368, 105 S.Ct. at 2001.

cation.[12] In addition to these special education services, S.D. also received weekly Chapter One instruction in math.[13] Goldberg extended her tutoring sessions with S.D. through the Summer of 1990, but at the personal expense of S.D.'s parents. In her professional judgment, Goldberg concluded that S.D. had made satisfactory educational progress in the first grade and, more particularly, in her special educational efforts.

After S.D. commenced her second grade year, a renewed IEP was developed on October 17, 1990. Again, S.D. received weekly special education services, as well as Chapter One instruction in mathematics. S.D.'s IEP was reviewed, again, in April of 1991, at which time it was concluded that her IEP from October should remain in effect for the remainder of her second grade year. During her second and third grades, S.D.'s special education teacher for her reading and writing instruction was Faye Hogenson ("Hogenson"). Hogenson holds a Master's Degree in Educational Psychology and is licensed to teach the mentally handicapped, the learning disabled and the emotionally and behaviorally disordered. She has been involved in teaching special education courses for over 26 years. When S.D.'s parents requested tutoring for the Summer of 1991, they were informed that it was not available through the School District, but they were successful in independently hiring Keenan as S.D.'s tutor—again, however, at their own expense. At the close of S.D.'s second grade year, Hogenson was concerned that S.D. was exhibiting a frustrating amount of inconsistency in her ability to read and to write. Nevertheless, she felt that S.D. was making progress in her educational accomplishments and, by the end of her third grade year, Hogenson was satisfied that S.D. was demonstrating an acceptable degree of consistency in her reading and writing abilities, and that she had mastered the educational objectives that had been set for her.

During the Spring of 1991, S.D. began seeing a licensed consulting psychologist, Dr. Mary Ann Versteeg–Halbert ("Halbert"). This consultation resulted from S.D.'s disruptive and self-abusive conduct at home—conduct that was not replicated during her attendance at school. In the course of her therapy sessions, Halbert suggested that further neuropsychological testing be conducted by Dr. Carmen Gutterman. In August of 1991, Dr. Gutterman concluded that S.D.'s learning problems were severe, and she strongly recommended that S.D. be consid-

12. More fully stated, Goldberg has an elementary education degree which she obtained in 1960, at the same time as she acquired her elementary education license for grades one through six. In 1974, Goldberg completed her licensure for learning disabilities and, in 1975, she completed her licensure for remedial reading. Thereafter, in 1978, she was awarded her licensure for emotionally/behaviorally dysfunctional children and, in 1982, she completed her Masters Degree in elementary education and has 60 additional credits beyond her Masters Degree. Goldberg has been teaching for 33 years, of which 28 have been invested in special education, and with all of those years, but for two or three, having related to teaching at the first grade level.

13. Chapter One is a Federal program, which is not as restrictive as special education, and which, here, taught S.D. basic arithmetical concepts in a small group setting. See generally, *Title 20 U.S.C. § 2724.* According to Carlson, the School District resorts to special education as a final step. As a consequence, S.D. received Chapter One instruction in math because her teaching team regarded her mathematics assessment as being of doubtful validity, and felt that the Chapter One program was appropriate in supplementing and reenforcing her classroom work in math. According to this Record, the parents of S.D. were aware of the nature of, and of her need for, Chapter One training in math and they expressed no disagreement with that program.

The HRO concluded that the "District violated federal law when it provided [S.D.] with Chapter One services instead of special education services in math." As support for this proposition, the HRO cites a non-existent "34 C.F.R. § 1014(d)(1)." In actuality, any asserted violation would relate to the source of the funding for the mathematics program that S.D. received under Chapter One. In pertinent part, Title 20 U.S.C. § 2724(d)(1) provides as follows:

Funds under this part may not be used to provide services that are otherwise required by law to be made available to such children. While the HRO's depiction of this funding error has a condemnatory air, we are unpersuaded that the District's "violation" of this provision discredits, in any meaningful way, the HO's factual finding that S.D. benefitted from her Chapter One math instruction. More particularly, we find no sustainable basis for the HRO's deletion of these factual findings from her decision in this matter.

ered for placement at the Groves Learning Center ("Groves"), a specialized school for children with learning and language difficulties which is located within the boundaries of the School District.

In September of 1991, S.D. returned to Peter Hobart to start her third grade year. She continued to receive special education assistance, as well as Chapter One assistance in math. At that time, standardized testing of her basic skills documented that S.D. had a composite score at the 2nd percentile, a reading score at the 23rd percentile, a language score at the 8th percentile, and a math score at the 1st percentile.[14] In late September of 1991, Dr. Susan Storti, a psychological consultant in educational disabilities, evaluated S.D. and concluded that she exhibited the characteristics of a visually-based dyslexic. During this period of time, S.D. was also evaluated for an attention deficit disorder ("ADD"),[15] by a neurologist, Dr. Reno Backus, and by her pediatrician, Dr. James R. Moore. In a controlled test that was conducted by Dr. Storti, S.D. favorably responded to the administration of Ritalin, which is a commonly prescribed medication for ADD. *Physicians' Desk Reference*, at p. 835 (48th Ed.1994). Despite the opinion of S.D.'s physicians, that she had treatable ADD which would benefit from daily drug therapy, the prescribed course of Ritalin was short-lived

as S.D. complained about its administration and it was discontinued without any investigation as to whether a substitute medication, having similar therapeutic worth, could be prescribed.[16] After some delay, during which the reports and evaluations of the examining physicians were gathered, an IEP was developed on December 13, 1991. This IEP prescribed a continuation of the regular classroom instruction, with a resource room being available for assistance in social studies and science, and with Chapter One assistance in mathematics. About this same time, however, the level of cooperation between S.D.'s parents and the School District began to deteriorate. For the first time, S.D.'s parents inquired about S.D.'s possible placement at Groves, but the School District expressed a refusal to pay for such a placement. On December 18, 1991, S.D.'s mother wrote to the School District, advising that she considered S.D.'s most recent IEP to be inadequate, but that S.D. would, nonetheless, remain at Peter Hobart for the time being.

On January 30, 1992, a conciliation conference was conducted in order to address the issues which surrounded S.D.'s most recent IEP, and Dr. Storti's potential involvement in planning goals and objectives for S.D.'s future education.[17] Placement at

---

**14.** In common parlance, a 2nd percentile score means that all but two persons in a standardized group of 100 would be above the 2nd percentile.

**15.** As related by *The Merck Manual:*

The primary signs of ADD with or without hyperactivity are a child's display of inattention and impulsivity. * * * Inappropriate inattention causes increased rates of activity and impersistence or reluctance to participate or respond. * * * Inattention is described as a failure to finish tasks started, easy distractibility, seeming lack of attention, and difficulty concentrating on tasks requiring sustained attention. Impulsivity is described as acting before thinking, difficulty taking turns, problems organizing work, and constant shifting from one activity to another. Impulsive responses are especially likely when involved with uncertainty and the need to attend carefully.

* * * * * *

Inattention and impulsivity restrict development of academic skills and concepts, thinking and reasoning strategies, motivation for school, and adjustment to social demands. Behavior of ADD children often is more resis-

tant to treatment than that of children with other behavioral disorders.
*The Merck Manual,* at p. 2103 (16th Ed.1992); see also, *Diagnostic and Statistical Manual of Mental Disorders—Fourth Edition (DSM–IV),* at pp. 78 *et seq.* (4th Ed.1994).

**16.** The HO noted the anomalous circumstance of a therapeutic course of medical treatment being discontinued because of a ten-year old's refusal to administer prescriptive medicine. We, too, find this to be a peculiar development, particularly in view of the obvious relationship between untreated ADD and cognitive impairments. On this record, we are unable to discount the real potential that S.D.'s ADD was a substantial cause of an appreciable portion of her learning difficulties and we find her parents' apparent disregard for the implications of S.D.'s ADD to be without any clear explanation.

**17.** The IDEA envisions a "cooperative approach" between school officials and the parents of a handicapped child in "developing the child's educational program and assessing its effectiveness." *Burlington School Comm. v. Mass. Dept.*

Groves was not discussed during this conference. The School District concluded that Dr. Storti would have the opportunity to evaluate S.D. and to monitor her progress to some degree, but that she would not be permitted to assess the success of an IEP, since that evaluatory function was the sole responsibility of the District.

On March 12, 1992, a mathematics addendum was added to the IEP, with special education prescribed which would replace the Chapter One services in addressing S.D.'s numeration skills, number fact skills, and problem-solving and measurement abilities. On that same date, extended school year services were discussed at a meeting between Dr. Storti and the School District's special education staff. As well, around this same period of time, S.D.'s parents requested the School District to subsidize a summer program for S.D. at Groves.[18]

On March 27, 1992, what ultimately became the final IEP for S.D. was formulated. This IEP would remain in force through the balance of S.D.'s third grade year, and it prescribed weekly special education services in the regular classroom setting, and an extended school year from June 15 through July 2, 1992, as well as homebound instruction in August of 1992—all of which would be provided and paid for by the School District.

In April of 1992, S.D.'s parents requested Keenan to retain S.D. in the third grade and, in particular, both S.D. and her parents wanted her to continue under the tutelage of Keenan. Keenan referred the parents to School Principal Linda Wood ("Wood"), who advised that retention of S.D. at Peter Hobart would not be recommended.[19] Wood

---

of Ed., supra at 368, 105 S.Ct. at 2001; *Florence County School Dist. Four v. Carter*, 510 U.S. 7, 10–14, 114 S.Ct. 361, 364–65, 126 L.Ed.2d 284 (1993). As a consequence, the Act incorporates a series of "procedural safeguards" in order to assure the full participation of the parents in properly resolving any substantive disagreements over the education of their child. *Id.; Dellmuth v. Muth*, 491 U.S. 223, 225, 109 S.Ct. 2397, 2398, 105 L.Ed.2d 181 (1989); *Light v. Parkway C–2 School District*, 41 F.3d 1223, 1227 (8th Cir. 1994). Included among these safeguards is the conduct of a "conciliation conference" at which the parties' educational disputes may be addressed and, if possible, may be amicably resolved. Cf., *Minnesota Rule 3525.3700*.

18. At no time prior to S.D.'s election to transfer to Groves, did Dr. Storti recommend such a placement. Indeed, Dr. Storti had observed S.D.'s instruction in Hogenson's special education class and complimented Hogenson's approach as both extremely intensive and multisensory, particularly for a public school. Although she was actively involved in certain of the conferences that were devoted to the refocusing of S.D.'s IEP, Dr. Storti had not concluded that the School District's educational program for S.D. was inappropriate.

Nevertheless, when called to testify at the Administrative Hearing, Dr. Storti concluded that Groves provided S.D. with a better learning experience than had been available at the School District. She was the first to acknowledge, however, that she had not extensively observed S.D. at either the public or private School and, unfortunately, the force of her testimony was diminished by her acknowledgement, during cross-examination, that she had been, and continued to be, a member of Groves' Board of Trustees for some period of time. Whether counsel for S.D. was unaware of this past association, or had strategically decided to avoid the matter during the doctor's direct examination, we need not decide for any actual bias on Dr. Storti's part was not explored by counsel for the School District. We would merely observe that the HO was not persuaded by Dr. Storti's impression as to the superiority of the instructional program at Groves, but without reference to any partiality she may have harbored as a result of her trusteeship over that institution.

19. Notwithstanding S.D.'s contention that the School District's decision to advance her to the fourth grade was prompted by an institutionalized policy, Wood testified that the determination would always be made on a case-by-case basis and, in this instance, was justified for the following reasons:

> 1. S.D. received individualized instruction in her areas of deficiency and she was able to function with her peers in content areas such as science and social studies, so a generalized retention in the third grade would not advance her instructional goals;
> 2. S.D. displayed age appropriate maturity in many key areas such as in her verbal skills, general knowledge and helping behaviors with others; and,
> 3. S.D.'s self-esteem could be adversely impacted by her retention in the third grade and, in addition, she needed the capacity to compensate for her disability—a prospect that was possible in her interactions with members of her age appropriate peer grouping.

Nevertheless, the School District was appreciative of the strong interest of S.D.'s parents that she be retained in the third grade and provided an option that addressed their interest.

proposed that S.D. attend fourth grade at the Susan Lindgren Intermediate School, which was also within the School District or, if her parents were insistent upon S.D.'s retention in the third grade, that S.D. attend the third grade at Susan Lindgren where the only remaining third grade assignments could be arranged within the District.

On May 8, 1992, S.D.'s mother expressed her dissatisfaction with the IEP and with the District's proposed summer program, and she requested a conciliation conference in an effort to resolve the problem. On May 28, 1992, a conference was held and it was agreed that the District would provide services, in a group setting, for the summer periods that S.D. was able to attend and, thereafter, to provide private services. Nevertheless, the District would not agree to fund summer attendance at Groves.

During the Summer of 1992, S.D. participated in a District program for three weeks,[20] and also attended Groves for a four-week tutorial, at a cost of $780. S.D.'s mother, who was able to observe S.D. in both settings, concluded that the Groves program was more beneficial to her daughter. After her completion of these programs and her attendance at a summer camp, S.D. received the additional home tutoring that the District had agreed to provide, and that occurred in August of 1992.

On September 8, 1992, S.D. began to attend the fourth grade at Susan Lindgren. Her IEP was not formally implemented during the first two weeks of that school year, although S.D. was being observed by a special education teacher, Susan Host ("Host").[21] Host worked with S.D. to a limited extent during this same period of time since the process of adjusting to a new environment, rather than academics, was the highest order of priority in these first few weeks of the fourth grade. On September 14, 1992, S.D.'s parents requested that she be reassessed before the IEP was implemented, but this request was denied by the School District because she had been recently reevaluated and would again be evaluated later that Winter. On September 21 and 22, 1992, S.D. did not attend school, but was a visitor at Groves, where she and her parents agreed that she would attend on a trial basis. On September 28, 1992, S.D. went to Groves and, after a few days there, she made the adjustment to the new environment and she decided to stay enrolled there, rather than to return to Susan Lindgren.

■ Unlike her largely "mainstreamed" classwork at the School District, at Groves, S.D. was assigned to a classroom that was solely reserved for students who suffered from learning disabilities.[22] Following their unilateral placement of S.D. at Groves, her parents notified the School District, after-the-fact, of their decision to withdraw S.D. from Susan Lindgren. In a letter of notification to the Minnesota Department of Education, S.D.'s attorney requested a Due Pro-

20. During this period of Summer School, S.D. obtained her instruction, in reading, writing and mathematics, from Ms. Barbara Davis ("Davis"). Davis received her Bachelors of Science degree in elementary education from the College of St. Catherine, and she earned a Master of Arts degree, in special education, from the College of St. Thomas. In 1978, Davis was awarded certification for teaching emotionally and behaviorally dysfunctional children. She first taught special education in 1967.

21. Host holds a Bachelor of Science Degree in elementary education, and a learning disability license for emotionally and behaviorally disturbed children in classes from kindergarten to the twelfth grade. At the time of the Hearing before the HO, Host was in the process of completing the requirements for a Masters Degree, and she had been teaching special education students for a period of six years.

22. At its core, the IDEA has an indisputable preference for "mainstreaming" special education students; i.e., such students are to be educated, to the maximum extent appropriate, in a regular class setting. See, *Title 20 U.S.C. § 1412(5); Hendrick Hudson Dist. Bd. of Ed. v. Rowley,* supra at 202 ("The [IDEA] requires participating States to educate handicapped children with nonhandicapped children whenever possible."); *Light v. Parkway C-2 School District,* supra at 1227 (IDEA requires "policies of inclusion."); *Digre v. Roseville Schools Ind. D. 623,* 841 F.2d 245, 247 (8th Cir.1988); *Evans v. District No. 17 of Douglas County, Neb.,* 841 F.2d 824, 832 (8th Cir.1988) ("[C]hildren who can be mainstreamed should be mainstreamed, if not for the entire day, then for part of the day; * * *."); *Mark A. v. Grant Wood Area Educ. Agency,* 795 F.2d 52, 54 (8th Cir.1986), cert. denied, 480 U.S. 936, 107 S.Ct. 1579, 94 L.Ed.2d 769 (1987).

cess Hearing under the provisions of the IDEA. See, *Title 20 U.S.C. § 1400, et seq.*

■■■ As noted, the IDEA protects the educational rights of handicapped children in the following manner:

> In order for a State to qualify, under the IDEA, for Federal assistance in meeting the educational needs of handicapped children, it must, *inter alia*, have in effect a policy that assures all handicapped children the right to a "free appropriate public education," and establish procedural safeguards as required by Section 1415 of the Act.

See, *Title 20 U.S.C. § 1412(1) and (5).*

Among the procedural safeguards that are mandated by the IDEA, Section 1415(b)(2) requires an independent Due Process Hearing to be conducted by a State educational agency, so as to insure that the parents of handicapped children will be afforded an opportunity to register their complaints concerning a public school's evaluation or the educational placement of their child.[23] Pursuant to the Act, the State of Minnesota has promulgated Rules which create a procedure for the conduct of such Hearings, and S.D.'s request for a Hearing was pursuant to these Rules. See, Minnesota Statutes Section 120.17, Subdivision 3b(e), and Minnesota Rule 3525.4000.[24]

23. Moreover, under the Supreme Court's interpretation of the IDEA, a Hearing Officer can direct school authorities to reimburse parents for the expenses that they incur in providing a private, special education for their child, if it is determined that such a placement, rather than a proposed IEP, is proper under the Act. See, e.g., *Florence County School Dist. Four v. Carter,* supra; *Burlington School Comm. v. Mass. Depart. of Ed.,* supra. Such reimbursement is here being sought by S.D.

24. Minnesota Statutes Section 120.17, Subdivision 3b(e) provides as follows:

> Parents, guardians, and the district shall have an opportunity to obtain an impartial due process hearing initiated and conducted by and in the school district responsible for assuring that an appropriate program is provided in accordance with state board rules, if the parent or guardian continues to object to: (1) the proposed formal educational assessment or proposed denial of a formal educational assessment of their child * * *.

In response to the request of S.D.'s parents, on October 8, 1992, the Commissioner of the Minnesota Department of Education appointed Steve M. Mihalchick, a State Administrative Law Judge, to act as the HO, and scheduled a Hearing to be conducted on November 13, 1992. However, the Hearing was delayed, and was not convened until February of 1993, at which time testimony was presented for a period of twelve days. On June 2, 1993, the HO issued a decision which concluded that S.D.'s IEPs substantially satisfied the School District's obligation to provide S.D. with a "free appropriate public education," and that the District was not obligated to reimburse S.D.'s parents for the costs of her attendance or her evaluations at Groves, or to otherwise provide her with compensatory educational services.[25]

On June 17, 1993, S.D. filed an appeal from the HO's decision, as authorized by Minnesota Statutes Section 120.17, subdivision 2(g), and, on June 18, 1993, the Minnesota Commissioner of Education appointed Marilyn Roberts as the HRO. Thereafter, on July 16, 1993, S.D. challenged the qualifications of Roberts and, although S.D.'s challenge was denied by the Commissioner, Roberts later resigned from any further participation in the case.

In addition, Minnesota Statutes Section 120.17, Subdivision 3b(e) and Minnesota Rule 3525.4000 provide, in part, as follows:

> The hearing shall take place before an impartial hearing officer mutually agreed to by the school board and the parent or guardian. If the school board and the parent or guardian are unable to agree on a hearing officer, the school board shall request the commissioner to appoint a hearing officer.

25. Moreover, the School District was not generally required to reimburse the parents for the cost of private tutoring or for the evaluations which S.D. underwent. However, the HO ordered the School District to reimburse S.D.'s parents for the costs incurred in the summer tutoring that had been provided by Keenan and Goldberg, in the ADD evaluation that was performed by Dr. Backus, in the consultations of Dr. Storti, and in the counseling provided by Dr. Halbert. The District has not appealed that aspect of the HO's award.

Subsequently, on August 11, 1993, the Commissioner appointed K.S.[26] as the HRO to fill the vacancy created by Roberts' resignation. On August 24, 1993, S.D. filed a Motion to recuse K.S. as the HRO, but that Motion was denied. The HRO heard and considered additional evidence and, on September 13, 1993, issued her decision.[27] In that decision, the HRO concluded that the HO had erred in reaching a critical legal conclusion, for the HRO determined that S.D. had, indeed, been denied a "free appropriate public education" by the School District. As a result, the HRO sustained the HO's award of reimbursements, concluded that the School District was not obligated to reimburse S.D.'s parents for the costs of her evaluations or of her summer instruction at Groves, but would be required to reimburse her parents for the tuition paid at Groves from September 28, 1992, through the end of the 1993–94 school year. Further, the HRO directed the parties to develop an IEP for S.D., which would remedy the deficiencies in her last plan, so as to ensure S.D.'s smooth return to the School District in the Fall of 1994. Lastly, the HRO retained jurisdiction in order "to review and/or approve the IEP if either of the parties so requests."

On October 7, 1993, the School District filed this civil action as an aggrieved party under the judicial review provisions of the IDEA, and named S.D. and her parents as Defendants. See, *Title 20 U.S.C. § 1415(e)(2)*. Shortly thereafter, on October 12, 1993, the School District filed an Amended Complaint in order to name the HRO and the Commissioners as additional Defendants. In conjunction with her filing of an Answer and an Amended Answer, S.D. served a Counterclaim against the School District, and Cross-claims against the Defendant Commissioners and the HRO.[28] In her Counter-

26. The parties have acceded to maintaining the anonymity of the HRO as a result of the District's assertion that the HRO was biased because of her parenting of a learning disabled child. Although we find considerable error in the rulings of the HRO, there is no suggestion of evident bias. Moreover, we find no merit to the District's suggestion that the Minnesota Commissioner of Education survey the available HROs to determine whether any hold the distinction of being parents of children with disabilities. We find no basis to believe that such a parental responsibility would impact, favorably or unfavorably, upon the capacity of an HRO to responsibly and impartially rule upon the propriety of an educational program for a handicapped child.

27. At best, the HRO's treatment of S.D.'s request to submit additional evidence was muddled. Apparently, the HRO was interested in reviewing the "objective" tests which would assess S.D.'s educational progress at Groves, but the HRO was not amenable to considering the content of any affidavits which addressed the strengths and weaknesses of the "objective" test results. In view of the uncertainty surrounding what aspects of the "additional" evidence had been reviewed by HRO, the School District claims to have been denied due process. We find this argument somewhat strained in view of the District's stated intention of relying upon S.D.'s test scores at Groves in its own case-in-chief. Only when the School District thought that the HRO's consideration of that evidence would unnecessarily delay the rendering of her decision did the School District withdraw its intention to rely upon those test scores. Accordingly, we have reviewed those "objective" test results in formulating our recommended disposition of this matter.

28. During the course of oral argument, counsel for the School District and for S.D. conceded that they had asserted claims against the HRO in order to assure the maintenance and preservation of the Administrative Record. Undoubtedly, as an adjudicator, the HRO is wholly insulated from a claim which arises from her conduct as an adjudicator, by the principles of judicial immunity. See, *Forrester v. White*, 484 U.S. 219, 224, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988); *Brown v. Griesenauer*, 970 F.2d 431, 436 (8th Cir.1992); cf., *Redwood Village Partnership v. Graham*, 26 F.3d 839, 840 (8th Cir.1994). Although the doctrine of judicial immunity does not shield an adjudicator from prospective, injunctive relief, we see no prospect that such relief would be directed at the HRO under the circumstances before us. *Pulliam v. Allen*, 466 U.S. 522, 536–43, 104 S.Ct. 1970, 1977–82, 80 L.Ed.2d 565 (1984); *Lofton v. U.S. District Court for the Eastern Dist. of Ark*, 882 F.2d 300, 301 (8th Cir.1989).

More disturbing, however, is S.D.'s argument that a claim may be properly asserted against the HRO because of the HRO's comment, in her Memorandum of Decision, which was critical of the deportment of counsel for S.D. before the HRO. As explained by S.D.:

[T]he last paragraph of [the HRO's] decision [was] only one in a series of overt and covert threats communicated in writing, via innuendo, and through anonymous late night threatening phone calls received by Parents' counsel.

Unquestionably, this is the type of baseless, frivolous and professionally demeaning claim that the doctrine of judicial immunity is intended to foreclose. *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Duty v. City*

claim, S.D. alleges that the conduct of the School District violated the provisions of the IDEA; the protections of the Rehabilitation Act of 1973, Title 29 U.S.C. § 706 *et seq.;* the guarantees of the Americans with Disabilities Act of 1990, Title 42 U.S.C. § 12131 *et seq.;* the tenets of Title 42 U.S.C. § 1983; the Fourteenth Amendment to the United States Constitution; the provisions of Minnesota Statutes Sections 120.0111, 120.03, and 120.17; the protections of the Minnesota Human Rights Act, Minnesota Statutes Section 363.03, Subdivision 5; the Minnesota Government Data Practices Act, Minnesota Statutes Section 13 *et seq.;* and the common law of negligence. As a result of these purported violations, the Plaintiffs claim both actual and punitive damages against the School District.

With respect to her Cross-claims, S.D. asserts violations of the IDEA; of Title 42 U.S.C. § 1983; of Minnesota Statutes Section 120.17, Subdivision 3b and Minnesota Rule 3525.3300(Q); and of the common law of negligence. The School District, the HRO, and the Defendant Commissioners deny any wrongdoing, and each has moved for a dismissal of S.D.'s claims.

### III. *Discussion*

■ We preface our discussion of the issues with three general observations that we believe to be particularly warranted. First, while the HO, the HRO and the parties have viewed S.D.'s complaints as a continuum that has extended throughout her years at the School District, we center our attention—we think necessarily—upon the period of time at which S.D. and her parents decided to abandon her educational choices at Susan Lindgren. To do otherwise, would be to undermine the "cooperative approach" that the IDEA fosters and embodies. As a practical matter, if the participants in the formulation of an IEP resolve their differences through conciliation and yet are able to preserve those same disputes for presentation at a Due Process Hearing, then the prospects for combativeness eclipse any conciliatory promise the IDEA might otherwise

provide. We think the better view was expressed by the Court in *Town of Burlington v. Dept. of Educ., Com. of Mass.,* supra at 788:

> The ultimate question for a court under the [IDEA] is whether a proposed IEP is adequate and appropriate for a particular child at a given point in time.

See also, *Lenn v. Portland School Committee,* 998 F.2d 1083, 1086 (1st Cir.1993); *Roland M. v. Concord School Committee,* 910 F.2d 983, 990 (1st Cir.1990), cert. denied, 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991).

We do not suggest that the chronology of successive IEPs is not of relevance, or that a cumulative failure of school authorities to properly address a student's learning disabilities is extraneous to a challenge of that student's educational placement. Rather, we underscore that the "actions of school systems cannot be * * * judged exclusively in hindsight," that "[a]n IEP is a snapshot, not a retrospective," and that, "[i]n striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated." *Roland M. v. Concord School Committee,* supra at 992.

Second, inasmuch as the IDEA is a two-headed master, with both procedural and substantive considerations playing prominent roles, there is an inevitable tendency—as was the case here—for the educational forest to be lost in a grove of technocratic trees. We do not minimize the importance which the Courts have attached to the procedural preconditions of an acceptable IEP, but we underscore that an IEP need not have the paradigmatic precision of a military "close order drill" in order to pass muster. As the Court observed in *Lenn v. Portland School Committee,* supra at 1086:

> The IDEA does not promise perfect solutions to the vexing problems posed by the

*of Springdale, Ark.,* 42 F.3d 460, 462 (8th Cir. 1994); *Coleman v. Watt,* 40 F.3d 255, 259 (8th Cir.1994); *Weseman v. Meeker County,* 659 F.Supp. 1571, 1576 (D.Minn.1987). Notably, S.D. has failed to advance any plausible legal or

factual basis for the claim against the HRO, and both the School District's and S.D.'s actions against the HRO should be dismissed with prejudice, irrespective of our ruling on the Motion for Judgment on the Record.

existence of learning disabilities in children and adolescents. The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal education; it requires an adequate, rather than an optimal, IEP. Appropriateness and adequacy are terms of moderation. It follows that, although an IEP must afford some educational benefit to the handicapped child, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential.

We, therefore, examine the issues before us with a recognition that education is a social science, and that parents, teachers, school administrators, classmates and students do not lend themselves well to unyielding standards of human interplay.

Lastly, we think that the Record before us eloquently attests to the existence of more than one roadway that has been paved with good intentions.[29] The course of S.D.'s educational progress has been generously strewn with the good will, dedication and seemingly indefatigable perseverance of her teachers, of her parents and of her school administrators. Given the crippling effects of her severe cognitive impairment, it would seem inevitable that the frustration and anguish, which has attended her instruction, would polarize her familial and professional backers as one educational approach or another achieved less than enduring success. In short, in neither her schooling nor in her upbringing, has S.D. been the victim of any benign neglect or deliberate disregard.

While not determinative of any of the issues before us, these generalized remarks should lend some context and perspective to what follows, and should limn the peripheries of our analysis. With this backdrop, we turn to the Motions before us.

---

**29.** Each side avows the other's advocacy and purpose to have been driven by a perdition of one form or another. Indeed, even the HO and the HRO appear to have been drawn down the low road of the *ad hominem* in the course of their disputations. While we would not draw the allegory too far, we would note the oft repeated aphorism that "the road to hell is paved with good intentions." See, e.g., William James, *The Principles of Psychology*, Chapt. 10 (1890); John Ray, *English Proverbs* (1670); Bernard Shaw, *Maxims for Revolutionists*; Samuel Johnson, *Boswell's Life of Dr. Johnson, Everyman Edition*, Vol. 1, at p. 555. Here, however, we find no demons at play—all who have been concerned with S.D.'s educational development have had her best interests firmly in the forefront.

---

**A. S.D.'s Motion for Leave to Submit Additional Evidence.**

**1. Standard of Review.** In delineating the Record upon judicial review, the language of the IDEA makes clear that "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Title 20 U.S.C. § 1415(e)(2)*. Although phrased in a mandatory tone, the Courts have, with near uniformity, recognized the broad discretion that the reviewing Court wields in allowing any augmentation of the Administrative Record. As the Court expressed in the landmark case of *Town of Burlington v. Dept. of Educ., Com. of Mass.*, supra at 790:

> We construe "additional" in the ordinary sense of the word, Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1980), to mean supplemental. Thus construed, this clause does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony; this would be entirely inconsistent with the usual meaning of "additional." We are fortified in this interpretation because it structurally assists in giving due weight to the administrative proceeding, as Rowley requires. Rowley 458 U.S. at 206, 102 S.Ct. at 3051.

> A trial court must make an independent ruling based on the preponderance of the evidence, but the Act contemplates that the source of the evidence generally will be the administrative hearing, with some supplementation at trial. The reasons for supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occur-

ring subsequent to the administrative hearing. The starting point for determining what additional evidence should be received, however, is the record of the administrative proceeding.

In the absence of "solid justification" for the submission of additional evidence upon judicial review, the administrative hearing process would be undermined and would render meaningless Congress' admonition that the Courts ascribe "due weight" to those underlying proceedings. *Roland M. v. Concord School Committee*, supra at 996.

 In order to preserve the integrity of the administrative process, the Court of Appeals for the First Circuit suggested the following gatetending approach:

> The determination of what is "additional" evidence must be left to the discretion of the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial de novo. A practicable approach, we believe, is that an administrative hearing witness is rebuttably presumed to be foreclosed from testifying at trial. A motion may then be made to allow such a witness to testify within specified limits stating the justification for the testimony. In ruling on motions for witnesses to testify, a court should weigh heavily the important concerns of not allowing a party to undercut the statutory role of administrative expertise, the unfairness involved in one party's reserving its best evidence for trial, the reason the witness did not testify at the administrative hearing, and the conservation of judicial resources.

*Town of Burlington v. Dept. of Educ., Com of Mass.*, supra at 791. Although our Court of Appeals has yet to rule upon the meaning of "additional evidence," as that phrase has been employed in the context of the IDEA, we are satisfied that the indicia of Congress' intent, in promulgating the language of Section 1415(e)(2), would persuade the Court to adopt the reasoning and the holding of the Court of Appeals for the First Circuit, see, e.g., *Bernardsville Board of Education v. J.H.*, 42 F.3d 149, 161 (3rd Cir.1994); *Hunger v. Leininger*, 15 F.3d 664, 669–70 (7th Cir.1994), cert. denied, —— U.S. ——, 115

S.Ct. 123, 130 L.Ed.2d 67 (1994); *Ojai Unified School Dist. v. Jackson*, 4 F.3d 1467, 1473 (9th Cir.1993), cert. denied, —— U.S. ——, 115 S.Ct. 90, 130 L.Ed.2d 41 (1994), and that is the standard of review that we deploy here.

 2. *Legal Analysis.* While espousing an interest in presenting additional evidence during the proceedings on appeal, S.D. has not advanced a solid justification for the receipt of such a supplemental record. No proposed witnesses were identified, and those exhibits which S.D. proffered as "Documents Offered to Supplement the Record," are merely cumulative of the content of an already vastly extended Administrative Record. In an abundance of caution, however, at the Hearing in this matter, we requested counsel for S.D. to make an offer of proof as to the evidence that should properly supplement the Record below. In response, counsel obliquely suggested that the Court might wish to employ an expert witness, and that the emotional stability of S.D. might be an appropriate subject of further testimony. We find no justifiable need for the services of a Court-appointed expert witness, and we reject such an ill-defined proffer of further evidence, concerning S.D.'s emotional state, as unavailing. By Order dated August 20, 1993, the HRO authorized the following supplementation of the Administrative Record:

> Additional written evidence may be presented by both parties. This evidence will be limited to [S.D.'s] performance and progress at Groves during the 1992–3 school year, her emotional and psychological health since her enrollment at Groves, the district's plans, if any, for [S.D.] should she enroll in the district again this fall, and results of any tests performed on [S.D.] since the due process hearing.

Each of the parties elected to provide such additional information as then seemed appropriate. Given the pendency of the District's Motion for Judgment on the Record, we view the obscurity of S.D.'s identification of proposed new testimony to belie its indispensability. As the Court reasoned in *Roland M. v. Concord School Committee*, supra at 996:

> As a means of assuring that the administrative process is accorded its due weight

and that judicial review does not become a trial de novo, thereby rendering the administrative hearing nugatory, a party seeking to introduce additional evidence at the district court level must provide some solid justification for doing so.

Such justification is entirely wanting here and, despite the passage of sufficient time, S.D.'s proffer of a justification for any supplementation has not been forthcoming. Given the expansiveness of the Record before us, as it relates to the appropriateness of the District's education at the time that S.D. transferred to Groves, we are persuaded that a fully informed decision may be drawn as to that ultimate question without a further augmentation of the Record. Accordingly, S.D.'s Motion to Supplement the Record is denied.

**B.** *The District's Motion for Judgment on the Record.*

■ In reviewing an administrative determination under the IDEA, the Court must address two questions which are aimed at the School District's paralleling responsibilities to comply with the procedural and substantive requirements of the Act:

> First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Petersen v. Hastings Public Schools,* supra at 707, quoting *Hendrick Hudson Dist. Bd. of Ed. v. Rowley,* supra at 206–207, 102 S.Ct. at 3050–51.

Here, S.D. challenges both the procedural and substantive underpinnings of the District's promulgation of her IEP and, accordingly, our analysis addresses each category of error.[30]

1. *The Claimed Procedural Errors.*

a. *Standard of Review.* The Supreme Court has unmistakably recognized that the adequacy of an IEP is to be judged by whether the procedural requirements of the IDEA have been satisfied. In pertinent part, the Court stated:

> When the elaborate and highly specific procedural safeguards embodied in § 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid. It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, see, e.g., §§ 1415(a)–(d), as it did upon the measurement of the resulting IEP against a substantive standard.

*Hendrick Hudson Dist. Bd. of Ed. v. Rowley,* supra at 205–06, 102 S.Ct. at 3050. Nevertheless, not every technical violation of the procedural prerequisites of an IEP will invalidate its legitimacy. The settled rule has been expressed as follows:

> Courts must strictly scrutinize IEPs to ensure their procedural integrity. * * * Strictness, however, must be tempered by considerations of fairness and practicality: procedural flaws do not automatically render an IEP legally defective. * * * Be-

**30.** Since the IEP is jointly developed by a school district and the parents, there is a growing body of authority that "fairness requires that the party attacking its terms should bear the burden of showing why the educational setting established by the IEP is not appropriate." *Tatro v. State of Texas,* 703 F.2d 823, 830 (5th Cir.) aff'd in part and rev'd in part sub nom., *Irving Indep. School Dist. v. Tatro,* 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984); see also, *Johnson v. Independent School Dist. No. 4,* 921 F.2d 1022, 1026 (10th Cir.1990); *Cordrey v. Euckert,* 917 F.2d 1460, 1469 (6th Cir.1990).

On the other hand, a number of Courts have concluded that the burden of proof at trial rests upon the party who challenges the final decision of the administrator. See, *Hampton School Dist. v. Dobrowolski,* supra at 54; *Roland M. v. Concord School Committee,* supra at 991, citing *Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C.Cir. 1988); *Spielberg v. Henrico County Public Schools,* 853 F.2d 256, 258 n. 2 (4th Cir.1988), cert. denied, 489 U.S. 1016, 109 S.Ct. 1131, 103 L.Ed.2d 192 (1989). For our purposes here, we think the debate is largely academic for, given the preponderance evidence standard, we are convinced that the School District is entitled to Judgment irrespective of who should, initially, bear the burden of proof.

fore an IEP is set aside, there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits. *Roland M. v. Concord School Committee,* supra at 994; see also, *Murphy v. Timberlane Regional School Dist.,* 22 F.3d 1186, 1196 (1st Cir.1994); *Hampton School Dist. v. Dobrowolski,* 976 F.2d 48, 54 (1st Cir.1992); *Burke County Bd. of Ed. v. Denton,* 895 F.2d 973, 982 (4th Cir.1990); *Doe By and Through Doe v. Defendant I,* 898 F.2d 1186, 1190–91 (6th Cir.1990).

As a consequence, a challenge to the validity of an IEP, based upon a "laundry listing" which details a "myriad of technical" deficiencies, may well be insufficient to discredit the appropriateness of the education that was shouldered by that IEP. *Doe By and Through Doe v. Defendant I,* supra at 1190, 1191; *Evans v. District No. 17 of Douglas County, Neb.,* 841 F.2d 824, 828–31 (8th Cir. 1988).

b. *Legal Analysis.* Both the HO and the HRO found technical deficiencies in the IEPs that the parties had jointly prepared for S.D.'s instructional program. Although the HO concluded that the deficiencies were harmless, the HRO took exception to that conclusion as follows:

> Though the Hearing Officer concluded the Student's IEPs were lacking he nonetheless concluded that she received an appropriate education. I cannot agree. The IEPs did not contain the specificity required by federal and state law, they were deficient in providing her with math services (until the end of the third grade), did not address her emotional needs and did not provide a learning environment that addressed her ADD. I find these deficiencies went beyond harmless error and constitute a failure to provide an appropriate education.

Unfortunately, the HRO did not attempt to explain how any of the purported deficiencies had impacted upon the appropriateness of S.D.'s educational experience. Furthermore, by gathering her litany of asserted deficiencies into a broadly expressed flaw, the HRO holds the District accountable for IEPs which received the unconditional acceptance of S.D.'s parents, and blurs the standard by which S.D.'s IEP, that prompted her decision to leave the School District, was adjudged. Accordingly, we find reversible error.

In our view, with but inconsequential exception, the School District properly assured that S.D.'s parents were active participants in the development and implementation of her IEPs. The repeated intimations of her parents, that they were not entirely acclimated to the prospect of any discord in the promulgation of S.D.'s IEPs, is not substantiated by this Record. See, *Chuhran v. Walled Lake Consol. Schools,* 839 F.Supp. 465, 471 (E.D.Mich.1993) ("[T]echnical defects are not sufficient to render the IEP inappropriate if the parents and district are aware of the relevant information."). To the contrary, the educational growth of S.D. has clearly benefited from the aggressively participative role that her parents played in the formulation of her instructional agenda.[31] Their expressions of concern and their requests for contemporaneous reports on S.D.'s accomplishments did not fall upon deaf ears. Indeed, as events progressed to the ultimate point of irreconcilability, S.D.'s parents—and particularly her mother—assumed a greater responsibility for assuring the presence of those consultants, who they felt would be instrumental in realigning S.D.'s educational program, at the IEP consultative and conciliatory conferences. It was by no accident that the health care professionals, who were treating S.D.'s emotional and educational complications, were present when S.D.'s final IEP was subjected to intense reconsideration. Accordingly, insofar as assuring adequate parental involvement and participation in formulating S.D.'s IEP, we find no appreciable procedural deficiency on the District's

---

31. In our view, the facts of this case corroborate the confidence expressed by the Supreme Court that "parents and guardians will not lack ardor in seeking to ensure that handicapped children receive all of the benefits to which they are entitled by the [IDEA]." *Hendrick Hudson Dist. Bd. of Ed. v. Rowley,* supra at 209, 102 S.Ct. at 3052.

part. See, *Doe By and Through Doe v. Defendant I,* supra at 1190–91 (Procedural safeguards emphasized by *Rowley* pertain to the process by which the IEP is produced, "rather than the myriad of technical items that must be included in the written document.").

Moreover, unlike a chemical formula, which will produce the same reaction so long as the laws of science endure, an IEP will not produce a perfect, predictable result with the same inevitability. While the HRO takes the District to task for failing to address, in the confines of the IEP, S.D.'s emotional needs or the impact of ADD upon her educational program, we think the complaint is grossly overstated. At no time did S.D. exhibit disruptive, emotional misbehavior in her attendance at the District's schools. As best as this Record would reflect, S.D.'s emotional disposition at school was remarkable only to the extent that she was pleasant in her exchanges with her instructors and enjoyed assisting her classmates. Whatever emotions may have been vented in her home environment, there is no suggestion that they were replicated in S.D.'s school activities, or adversely affected her instructional accomplishments at school. While we can accept that the District may bear some responsibility for school-related emotional distress irrespective of where it should be exhibited, we are at a loss to ascertain what more the District could do than consult with its own staff and with S.D.'s health care professionals in assessing the significance of S.D.'s psychological state. Here, there is no evidence that the District refused the request of either S.D.'s parents or of her psychologists for a prescribed course of emotional care.

More importantly, we think the HRO clearly misapprehended the state of the evidence as it related to S.D.'s diagnosis of ADD. The only involvement of the District in the diagnosis and treatment of S.D.'s ADD was solicited by Dr. Storti, after her clinical tests revealed that the condition was treatable with a prescribed course of Ritalin. Dr. Storti enlisted the assistance of S.D.'s pediatrician in order to assure that the District would assist in administering a mid-day dosage of medications. Nothing in this Record would permit an inference that the state of S.D.'s ADD and her self-imposed refusal to treat that condition was attributable to any act on the District's part. Unlike the HRO, we can not responsibly overlook the abandonment by S.D., and her parents, of a course of prescribed medical care for an impairment which, unquestionably, can adversely impact upon a child's ability to learn. We are aware of no authority, and S.D. has cited none for our review, which would ascribe any responsibility to the School District for a student's failure to adhere to prescribed clinical care for a treatable medical condition.

Further, whatever may be said of S.D.'s prior IEPs, her IEP at the time she transferred to Groves included special education for her difficulties in mathematics. Accordingly, looking at the "snapshot" of S.D.'s relevant IEP, there was no deficiency in the subject area of mathematics as ascribed by the HRO. Of course, the HRO also concluded that the District had violated Federal law by utilizing Chapter One funding for S.D.'s instruction in math, but the HRO made no finding that the Chapter One instruction was deficient substantively, nor would the Record permit any such finding.

As to the remainder of the technical deficiencies that the HRO recited in her Conclusions of Law, we find those equally harmless. As the HRO explained:

> Certain other procedural errors were made by the District as stated in my conclusions of law. While they are troublesome, I did not base my decision on these procedural errors.

Were any of these purported deficiencies of substantial import, we are satisfied that the HRO would have explained their substance. On administrative review, more is demanded of an HRO than a mere litany of perceived imperfections in the content of an IEP. Unless, on a cogently rational basis, those imperfections are causatively related to a serious impairment of a parent's opportunity to knowledgeably participate in the IEP procedure, or to the deprivation of educational benefits, they should not produce—as if by

reflex action—an invalidation of the IEP process.[32]

In sum, we are satisfied, on the entirety of the Record before us, that the District satisfactorily complied with the procedural mandates of the IDEA.

### 2. The Claimed Substantive Errors.

■ Where, as here, a student is transferred by her parents to a private school, the student's School District would be responsible for the costs of that placement if the Court determines that the IEP, which called for the student's instruction in a public school, was "inappropriate," and that the private placement was proper under the Act. *Burlington School Comm. v. Mass. Dept. of Ed.*, supra at 370, 105 S.Ct. at 2002. Since we have already concluded that the School District's IEP for S.D. satisfied the procedural requirements of the Act, we need now only consider whether, substantively, the IEP was adequate, and whether S.D.'s placement at Groves was proper. *Roland M. v. Concord School Committee*, supra at 1000; see also, *Florence County School Dist. Four v. Carter*, supra at 8, 114 S.Ct. at 363 (Parents entitled to a reimbursement for a private placement *"only* if a federal court concludes both that the public placement violated IDEA, and that the private school placement was proper under the Act." [Emphasis in original] ). Our analysis, therefore, turns to these substantive issues.

■ a. *Standard of Review.* In addition to its procedural requirements, the IDEA also mandates that a student's IEP be "reasonably calculated to enable the child to receive educational benefits." *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, supra at 207, 102 S.Ct. at 3051. The Court has gone on to explain:

> Insofar as a State is required to provide a handicapped child with a "free appropriate public education," we hold that it satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education and must comport with the child's IEP. In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.

*Id.* at 203–04, 102 S.Ct. at 3049.

As would seem obvious, while a State may not diminish the educational criteria established under Federal law, "a state is free to exceed, both substantively and procedurally, the protection and services to be provided to its disabled children." *Town of Burlington v. Dept. of Educ., Com. of Mass.*, supra at 792. Some States have elected to exceed the substantive Federal criteria, but Minnesota is not one of them.[33] *Schuldt v. Mankato*

32. As the Court noted in *Roland M. v. Concord School Committee*, supra at 995:

> While personalized detail will always be helpful in evaluating an IEP, we decline the invitation to bar [local educational agencies] from using standard forms or to insist that every conclusion and prediction contained in an IEP be exhaustively and explicitly documented.

33. S.D. urges us to construe Minnesota Statutes Section 120.0111 as imposing upon the State, and its school districts, an obligation to develop each student to his or her "maximum potential." Section 120.0111 reads as follows:

> The mission of public education in Minnesota, a system for lifelong learning, is to ensure individual academic achievement, an informed citizenry, and a highly productive work force.

> This system focuses on the learner, promotes and values diversity, provides participatory decision-making, ensures accountability, models democratic principles, creates and sustains a climate for change, provides personalized learning environments, *encourages learners to reach their maximum potential* and integrates and coordinates human services for learners. [Emphasis added].

We find no room in the language employed by the Minnesota Legislature to mandatorily impose an obligation upon the State to educate all students to their "maximum potential." More importantly, the very Statute which addresses the State's obligation to educate disabled children contains no reference to a "maximum potential." See, *Minnesota Statutes Section 120.17, Subdivision 3a.*

*School Dist. 77*, 937 F.2d 1357, 1361 (8th Cir.1991); *Bowman v. Independent School District No. 241*, Case No. 50–2103–6686–3 (Minn.Dept.Educ., October 16, 1992). "The objective of the federal floor, then, is the achievement of effective results—demonstrable improvement in the educational and personal skills identified as special needs—as a consequence of implementing the proposed IEP." *Town of Burlington v. Dept. of Educ., Com. of Mass.*, supra at 788.

In addition, under the IDEA, mainstreaming is preferred and States must educate handicapped and non-handicapped children together "to the maximum extent appropriate," and the special education must be provided in the "least restrictive environment." *Title 20 U.S.C. § 1412(5); 34 C.F.R. § 300.552(d).*

█ b. *Legal Analysis.* In weighing the feasibility of formulating a minimum Federal standard, by which to measure the adequacy of benefits provided under the IDEA, the Court recognized "that the benefits obtainable by children at one end of the spectrum [of handicapped students] [would] differ dramatically from those obtainable by children at the other end, with infinite variations in between." *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, supra at 202, 102 S.Ct. at 3048. As a consequence, the Court settled upon a qualitative standard; namely, that "some benefit" would have to result from the educational process. *Id.* at 200, 102 S.Ct. at 3047. "The educational benefits do not have to maximize a child's potential, but must only offer a 'basic floor of opportunity' which will allow the child to progress with his education." *Brown v. Wilson County School Bd.*, 747 F.Supp. 436, 442 (M.D.Tenn.1990), quoting *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, supra at 201, 102 S.Ct. at 3048; see also, *Lenn v. Portland School Committee*, supra at 1091; *Gehman v. Prudential Property and Cas. Ins. Co.*, 702 F.Supp. 1192, 1194 (E.D.Pa.1989).

█ Here, the HRO concluded that S.D. had received no such benefit since, in the HRO's view, she was unable to read, write or perform math upon her entry into the fourth grade. Even if true, which we do not believe to be the case, there is nothing in this Record

to suggest that S.D.'s public education was at fault. The IDEA does not demand that the State cure the disabilities which impair a child's ability to learn, but requires a program of remediation which would allow the child to learn notwithstanding her disability. The Record uniformly confirms that S.D.'s dyslexia will produce an inconsistency in reading and writing abilities, a tendency toward regression or recidivism upon the discontinuance of training, and a need for repetition and reenforcement in her instructional tasks. Notably, the Record does not suggest, let alone persuasively demonstrate, that S.D.'s instructional regime at Groves was materially different than that employed in the School District, with the singular exception of her segregation, at Groves, in a student body that was exclusively for the learning disabled.

Her educational milieu at Groves was not distinctive in its physical facilities, in its supportive services, or in its professional staff. Indeed, we wholly agree with the HO's observation:

It is interesting to note that the District generally assessed the same needs as did Groves and that it used virtually all of the same teaching techniques as are being applied at Groves. The District had computer programs that Sarah used to learn to tell time, just as she uses at Groves; the District used various manipulatives in teaching Sarah math, just as are used at Groves; the District used multisensory techniques in teaching reading such as tracing letters in sand or other material, just as used at Groves. The special educators at the District are generally better trained and more experienced than the special educators at Groves. The only real difference in the program provided at Groves is the small classroom setting of six to eight students and the presence in the school of only learning-disabled children.

Moreover, the supplemental evidence which was adduced before the HRO demonstrated that S.D.'s objective achievements at Groves, particularly in the area of her language skills, were not appreciably different than at the School District and, in fact, may have regressed somewhat.

While her proficiency at mathematics may have improved to some degree at Groves, the substantiality of that evidence, and its academic significance, is disputed. We would merely note that, overall, S.D.'s educational experience at Groves does not discredit the adequacy of her educational accomplishments at the School District. See, *Roland M. v. Concord School Committee*, supra at 991–92 (recognizing that academic results of private placement is relevant as but one factor in determining the appropriateness of that placement). Indeed, we do not find the instructional regimen between the two schools to be meaningfully distinct. Accordingly, based upon the entirety of the Record before us, we find and conclude that S.D. received a "free appropriate public education" at the School District, that her learning and language skills improved from grade to grade, that she demonstrated greater consistency as her instructions progressed,[34] and her exposure to a mainstreamed environment was beneficial to her socialization skills.[35]

Notably, S.D.'s comprehension in other areas of instruction was unaffected, or largely unaffected, by her dyslexic condition. For instance, the HO found—and we concur—that S.D. presents no special educational needs in social studies, science, art or gym, and that she was a happy and participative student at the School District. As a consequence of the class composition and structure at Groves, S.D. has no occasion to participate with non-handicapped students in these areas of study—areas in which she has no need for special services. While finding S.D.'s association with her disabled classmates at Groves "troubling," the HRO concluded, on an unspecified evidentiary basis, that "Groves' environment is clearly superior for the Stu-

dent's emotional needs." Of course, if the environment at Groves were, in fact, superior to that at the School District, then we would have no reason to believe that her placement at Groves should be "troubling" in any respect. Nor do we find any credible basis to believe that S.D.'s attendance at "Girl Scouts" or "YMCA activities" is a comparable experience to "mainstreaming," or is adequate to develop what the HRO recognized as essential coping skills if S.D. is ever "to accept her disability and interact with children without disabilities."

In sum, we do not find S.D.'s placement at Groves to be proper, particularly with its wholly segregated class structure. While the HRO concluded that, at Groves, S.D. did not "miss science, social studies, or art," the HRO provided no explanation as to why those courses should not be taught in a class in which S.D. would be associated with non-disabled children. Segregation for segregation's sake is anathema under the IDEA. We are satisfied that a preponderance of the evidence supports the HO's finding that "[S.D.] is fully capable of attending regular education classrooms during content subjects such as health, social studies[,] science, art and gym." The HRO regarded this finding to be flawed, but for reasons that are as imaginary as they are unfounded.

First, the HRO felt that her belief, that S.D. had made "minimal or no progress in the basic skills [of] reading, writing and mathematics," would inevitably cause her to "fall behind" because she could not read her "science and social studies textbooks." While, undoubtedly, an inventive mind can structure an instructional format which would impair S.D.'s educational growth, our

---

34. We are persuaded, as was the HO, that S.D.'s special education instructors at the School District, who were trained, experienced and knowledgeable in teaching students who are learning disabled, found objectively verifiable advancements in S.D.'s reading, writing and arithmetic skills. Although the HRO takes exception to the description of certain of these skills as having been "mastered," the instructors were questioned on that subject, they explained the meaning that they attached to that term, and we find the evidence to preponderate in support of the HO's findings in this respect.

35. If the School District's IEP is determined to be appropriate, then there is no need to inquire further as to the appropriateness of Groves' program. See, *Teague Independent School Dist. v. Todd L.*, 999 F.2d 127, 132 (5th Cir.1993); see also, *Florence County School Dist. Four v. Carter*, supra at 14, 114 S.Ct. at 366. As our discussion reflects, however, the two issues conjoin somewhat and, therefore, in the interests of completeness, our analysis continues to the second component of the *Burlington* standard. *Burlington School Comm. v. Mass. Dept. of Ed.*, supra at 370, 105 S.Ct. at 2002.

function is to review an Administrative Record and not to conjure worst-case scenarios. Here, consistent with the testimony of S.D.'s teachers, the HO properly found that "[S.D.] has never had a special education need or deficit in the areas of science, social studies, art gym or health," and that, "[w]ith appropriate modifications, [S.D.] can and has fully participated and succeeded in regular education in these subjects." In this finding, we find no error.

Next, the HRO suggests that "there is no evidence that the progress made in [science and social studies] was the result of the District's efforts." She continues by noting that S.D. was removed from these classes in order that she could attend her individualized instruction in the resource room, and that she received instruction from her parents and from public educational television. Rather than contradicting the HO's factual findings, as the HRO would appear to suggest, we think these observations underscore S.D.'s ability to progress in her education through means other than reading—means which the School District must have been providing, given the HO's recognition of S.D.'s success in these studies. In this same respect, we note the abundance of evidence that the School District's instructors were utilizing multisensory approaches with S.D. so as to promote her cognitive capabilities in ways which might otherwise be hindered by an educational process that was strictly confined to reading and writing.

Lastly, the HRO asserts that there was "uncontroverted evidence that the program provided by the District was detrimental to the Student's emotional well-being." Of course, the HRO does not address the emotional consequences of untreated ADD—a circumstance over which the School District had no control—nor does she consider the obvious fact that, insofar as this Record discloses, S.D.'s involvement in her classroom activities was seen as enjoyable and participative. Any serious contention that the School District was responsible for S.D.'s emotional outbursts at home would seem to be amply belied by her parents' reticence in candidly and openly addressing that subject with her educators—a reticence that they

now ascribe to a concern that their daughter would be perceived as emotionally or behaviorally disturbed. While we do not minimize the deterrent effects that such ulterior considerations may impart, we are unable to fault the School District for being less than fully appreciative of the extent of S.D.'s emotional circumstances when the implications of her emotional state were not, apparently, fully expressed until the conduct of the Due Process Hearing.

 For these reasons, we find, by a preponderance of the evidence, that Groves was not a proper placement for S.D., within the context of the IDEA. Necessarily, we express no opinion as to the desirability of that schooling for other purposes. Given the liberty of parents to select privately maintained, accredited institutions for the education of their children, and the admittedly respected curriculum of Groves, we do not doubt that the school provides educational benefit for the unique needs of some students. Nevertheless, even if Groves were able to provide S.D. with "a better education than that offered by the public school," so long as the District satisfied the "minimum federal standard of appropriateness," the IDEA "does not require school districts to reimburse parents who choose a superior placement for their child." *Hampton School Dist. v. Dobrowolski,* supra at 52, citing *G.D. v. Westmoreland Sch. Dist.,* 930 F.2d 942, 948–49 (1st Cir.1991). All we decide here is that, under the unique circumstances presented by this case, Groves does not offer benefits such as would warrant S.D.'s transfer at the public's expense, and that the School District's educational program was provided "in the least restrictive environment." See, *Title 20 U.S.C. § 1412(5)(B); 34 C.F.R. § 300.552(a); Evans v. District No. 17 of Douglas County, Neb.,* supra at 832.

 While the HRO's reasoning is not entirely clear, we doubt that this finding is substantially at odds with the underlying rationale for her decision that the School District was capable of providing S.D. with a free appropriate public education, and that any public subsidization of S.D.'s attendance at Groves could last for no longer than a period of two years. Where we diverge in

our views is at the point at which the HRO implicitly determined that S.D.'s educational experience at Susan Lindgren should not have been given a chance.[36] See, e.g., *Evans v. District No. 17 of Douglas County, Neb.*, supra at 831; *Doe By and Through Doe v. Defendant I*, supra at 1191. We are entirely satisfied that, had S.D.'s desire to remain in Keenan's class been honored in September of 1992, no transfer to Groves would have occurred.[37] We are also satisfied that the HRO's decision to limit S.D. to a two-year program at Groves—if explainable on any grounds—was attributable to her impression that the School District's educational program was flawed by a series of procedural imperfections which could be rectified through a mediation that the HRO sought to impose. Unfortunately, under the IDEA, the HRO was not assigned to mediate the parties' dispute, and we find no authority for the HRO's self-imposed retention of jurisdiction so as to assure the promulgation of an IEP that was to her liking. Of course, such a retention of jurisdiction would result in a

non-final and, therefore, a non-appealable decision—a result which is, at best, nonsensical.[38] We, therefore, recommend a reversal of the HRO's decision and an affirmance of the determination of the HO.

■ C. *S.D.'s Non–IDEA Claims.* In addition to her core claim under the IDEA— that the determination of the HRO should be affirmed—S.D.'s Counterclaims included allegations that the District violated her constitutional rights, so as to give rise to an action under Title 42 U.S.C. § 1983; violated the provisions of the Rehabilitation Act of 1973, Title 29 U.S.C. §§ 706, 794 and 794a; violated the protections prescribed by the Americans with Disabilities Act ("ADA"), Title 42 U.S.C. § 12131 *et seq.;* and violated her guarantees under the Minnesota Human Rights Act, Minnesota Statutes Section 363.01 *et seq.* Given our Recommendation as to S.D.'s core claim, we further recommend that these remaining causes of action be dismissed with prejudice.[39]

36. While it would have been preferable to have S.D.'s IEP at Susan Lindgren immediately effectuated, we find S.D.'s protestations in this respect unconvincing. The Record is without dispute that a change in classes and schools, particularly at the fourth grade, can be emotionally traumatizing. As a consequence, S.D.'s teachers at Susan Lindgren concentrated on her acclimation, and the acclimation of her classmates, to the fourth grade. Given the emotional component of S.D.'s educational experience, we can find no error in such a process of socialization and adjustment. Notably, S.D.'s IEP was not abandoned during this period nor is there any evidence which contradicts her teacher's impression that S.D. was successfully adjusting to the fourth grade.

37. More importantly, we agree with the HO that "[S.D.'s] parents never really decided whether [S.D.] would attend Groves," as "[S.D.] made that decision, pushed by her psychologist." As best as we can tell from this Record, on the fateful day on which S.D.'s transfer occurred, whether her drive to school would end at Susan Lindgren or Groves was entirely unknown. In the words of S.D.'s father:

> Well, that Monday we got her up to go to school and she wouldn't go to Groves so we got her up with the idea that she had to go to a school so we got her to go into the car with the same logic. She went in [her mother's] car and I stayed at home with [her sister] so when they left I knew that they were going somewhere to a school but I didn't actually know which school because [her mother] wasn't go-

ing to be able to drag her and we didn't want to drag her anywhere.

While, after-the-fact, a decision of this import can be rationalized, we think it telling that the mechanism by which the decision was initially made was largely fortuitous.

38. We resolve the finality issue on the basis of the HRO's Order, which states as follows:

> Jurisdiction is retained to review and/or approve the IEP if either of the parties so requests.

In contrast, her Memorandum of Decision permits no such election by the parties:

> If the Student's parents and the District cannot agree upon a mutually acceptable IEP for the Student for the 1994–5 academic year, I retain jurisdiction to review the IEP for its appropriateness.

Consistent with our view that the IDEA, and its related Federal and State Regulations, do not allow for the possibility that an Administrative Officer can place the proceedings in an indefinite hiatus, we extend controlling weight to the letter of the HRO's Order. Obviously, if the parties so elect, they can invest an HRO with continuing jurisdiction and with the duties of a mediator. Here no such election was made, and the HRO's decision was "final" for appeal purposes.

39. S.D. has also alleged a cause of action premised upon the District's negligence. We are aware of no authority which would recognize such a claim under the circumstances here, and S.D. has not drawn any to our attention. Appar-

■ We have no doubt that viable claims can be asserted against a School District under Section 1983, the Rehabilitation Act and the ADA. *Digre v. Roseville Schools Ind. D. 623*, 841 F.2d 245, 249–50 (8th Cir. 1988); *Lue v. Moore*, 43 F.3d 1203, 1205 (8th Cir.1994), citing *Rodgers v. Magnet Cove Public Schools*, 34 F.3d 642, 645 (8th Cir. 1994). While that has not always been the case, Congress has left no doubt as to its intention to allow such claims to proceed in tandem with an IDEA claim. See *Smith v. Robinson*, 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984) (Section 1983 and equal protection claims preempted by IDEA), overruled by *The Handicapped Children's Protection Act of 1986*, Pub.L. No. 99–372 § 3, 110 Stat. 796 (1986). By amendment in 1986, Section 1415(f), the IDEA was modified to read:

Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973 [20 U.S.C.A. § 790, et seq.], or other Federal statutes protecting the rights of handicapped children and youth, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.[40]

Our Court of Appeals has held that this Section was designed to reestablish the statutory rights that "were repealed by the U.S. Supreme Court in *Smith v. Robinson.*" *Digre v. Roseville Schools Ind. D. 623*, supra at 250, quoting *Mrs. W. v. Tirozzi*, 832 F.2d 748, 754 (2d Cir.1987).

■ Notwithstanding that S.D. is entitled to commence a Section 1983 action and actions under the Federal disability Statutes, the predicate acts upon which she has premised those actions have been determined to be permissible acts under the IDEA.[41] As a

---

ently, S.D. is of the impression that a purported violation of Minnesota Statutes Section 120.17 authorizes a negligence *per se* claim, but she offers no authority for that extraordinary proposition. In view of our Recommendation on the Motion for Judgment on the Record, we find no breach of duty such as would support an actionable claim for negligence. Accordingly, we conclude that S.D.'s negligence allegations fail to state a claim upon which relief can be granted, and we recommend that the action in negligence also be dismissed.

Similarly, we find no actionable claim under the provisions of the Minnesota Government Data Practices Act, Minnesota Statutes Section 13 *et seq.*

**40.** We neither reach, nor do we express any view upon, the issue of whether S.D. properly exhausted her administrative remedies—an issue that has intrigued a variety of Courts. See, e.g., *Hoeft v. Tucson Unified School Dist.*, 967 F.2d 1298, 1304 (9th Cir.1992); *Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 159 (2d Cir.1992); *Stauffer by DeMarco v. William Penn School Dist.*, 829 F.Supp. 742, 748 (E.D.Pa.1993); *Carey v. Maine School Administrative Dist. No. 17*, 754 F.Supp. 906, 922 (D.Me.1990); *Waterman v. Marquette–Alger Intermediate School Dist.*, 739 F.Supp. 361, 364–65 (W.D.Mich.1990); *Field v. Haddonfield Board of Education*, 769 F.Supp. 1313 (D.N.J. 1991); but see, *Manchester School District v. M.F.*, 1994 WL 485754 (D.N.H. August 31, 1994); cf., *Digre v. Roseville Schools Ind. D. 623*, supra at 250.

**41.** Specifically, S.D. has alleged that the District violated her Federal constitutional or statutory rights because of its policy to deny grade retention; because of its delay in identifying children with learning disabilities prior to grade one; because of its substitution of Chapter One services for special education assistance in math; because it allowed certain of its instructors to profit from its decision to deny S.D. a free extended school year in 1990 and 1991; because of its involvement in the Due Process Hearing and subsequent proceedings; and because of its disparate treatment in failing to encourage S.D. to reach her "maximum educational potential." Either these claims have been found to be without merit, or the School District has been directed to reimburse S.D. for any educational expenses that S.D. wrongfully incurred. Therefore, we find no basis upon which further relief is warranted.

We would add, since we have not previously addressed the argument, that S.D. has no legitimate complaint concerning the scheduling of the Due Process Hearing. As both the HO and the HRO determined:

The October 8, 1992, Department of Education letter appointing the Hearing Officer set the hearing for November 13, 1992. The requirement of Minn.Stat. § 120.17, subd. 3b(f), that the hearing decision be rendered no later than 45 days after a request for a hearing was waived by [S.D.] and her parents due to their counsel's unavailability during the months of November and December and subsequent agreements as to the hearing and briefing schedules.

consequence, no viable claim can exist under these other statutory provisions, in the absence of a claim which, factually and legally, is distinct from those that have already been resolved. Cf., *Lenn v. Portland School Committee*, supra at 1085 n. 1 (Court assumes, *arguendo*, accuracy of parties' conclusion that sweep of IDEA and Rehabilitation Act are identical); *Monahan v. State of Neb.*, 687 F.2d 1164, 1170 (8th Cir.1982) (Dismissing Rehabilitation Act and Section 1983 claims where same theories were advanced under IDEA). Notably, S.D. makes no such contention. We, therefore, find that S.D.'s independent causes of action add nothing substantively to her core IDEA claim, and we recommend that her Counterclaims against the School District be dismissed.[42]

◼ D. *S.D.'s Petition for Attorneys' Fees.* Arguing that she is a "prevailing party" as a result of the District's failure to challenge the HO's award of certain reimbursements, S.D. claims an entitlement to her attorneys' fees under Section 1415(e)(4)(B) of the IDEA, which provides as follows:

> In any action or proceeding brought under this subsection, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to parents of a handicapped child or youth who is a prevailing party.

A claim for attorneys' fees under the IDEA "is similar to the civil rights attorney's fees award statute, 42 U.S.C. § 1988," and "should ordinarily be awarded to the prevailing party unless 'special circumstances' exist to make an award unjust." *Borengasser v.*

*Arkansas State Bd. of Educ.*, 996 F.2d 196, 199 (8th Cir.1993).

◼ On occasion, determining if a party has "prevailed" poses a thorny threshold issue which, ordinarily, is dependent upon whether that party has "succeeded on 'any significant issue * * * which achieve[d] some of the benefit [she] sought' in filing her due process complaint." *Johnson v. Bismarck Public School Dist.*, 949 F.2d 1000, 1003 (8th Cir.1991), citing and quoting *Texas State Teachers Ass'n v. Garland Ind. School Dist.*, 489 U.S. 782, 791–92, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989). In *Garland*, the Court expressly noted that "the *degree* of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee, not to eligibility for a fee award at all." *Texas State Teachers Ass'n v. Garland Ind. School Dist.*, supra at 790, 109 S.Ct. at 1492 [emphasis in original]. Here, S.D. requests an award of reasonable attorneys' fees and costs in the amount of $47,595.64, and she has submitted a collection of cryptic time accountings which purport to verify the reasonableness of the fee request.

◼ Given the District's acceptance of the HO's determination that S.D. and her parents should be reimbursed in the amount of $2895.50, a determination that S.D. was not a prevailing party would be excessively harsh. See, *Johnson v. Bismarck Public School Dist.*, supra at 1003, and cf., *Jones v. Lockhart*, 29 F.3d 422, 423–24 (8th Cir.1994); *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). Nevertheless, the limited nature of S.D.'s success cannot be overlooked and will surely impact upon the

---

Not surprisingly, S.D. offers no meritorious basis to disregard these findings which, independently, we reconfirm upon our own review of the Record.

**42.** Similarly, we conclude, without extended discussion, that S.D. has not established a viable basis, in fact or law, for her Cross-claims against the Commissioners, both past and present. As to these Defendants, S.D. seeks a Declaratory Judgment that the procedure that the Commissioners utilize in appointing Administrative Hearings Officers is fundamentally flawed and has denied S.D. due process of law. As we have noted elsewhere, any delays in the conduct of the Due Process Hearing, and in the timing and comple-

tion of any subsequent administrative proceedings, was voluntarily acquiesced in by S.D. or her legal representative. Moreover, her concerns about the appointive process are unfounded. She invoked those procedures which could lead to the disqualification of an Administrative Officer on several occasions and, while she was not entirely successful in these attempts, there is no competent basis for her to allege bias or prejudice as a result of the appointive process. Therefore, finding no claim upon which relief can properly be granted, we recommend that S.D.'s counterclaims should also be dismissed with prejudice.

ultimate size of the award which should be granted. *Id.* at 1003, citing *Hensley v. Eckerhart,* 461 U.S. 424, 440, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40 (1983).

On the Record before us, however, we are unable to calculate a reasonable fee since S.D.'s submitted time listings are too adumbrated to permit an intelligent appraisal of the appropriateness of the charges that were made. Moreover, we are not satisfied that anything other than an interim request for fees has been made and, in the interests of judicial efficiency, we do not wish to address the reasonableness of any fee request on more than one occasion. Accordingly, we direct that, within fifteen days from the date of this Report and Recommendation, S.D. serve and file those business records which will document the hours expended and the services that were provided during the times listed. The Court will not need additional briefing on this issue and the matter will be deemed submitted upon the Court's receipt of S.D.'s supporting documentation.

NOW, THEREFORE, It is—

ORDERED:

1. That S.D.'s informal Motion to supplement the Record in this matter is DENIED.

2. That K.M.'s Motion to Intervene is DENIED.

3. That the Plaintiff's Motion to Dismiss or, Alternatively, to Postpone Consideration of S.D.'s Petition for Attorneys' Fees [Docket No. 47] is DENIED.

4. That S.D. is directed to serve and file, within fifteen days from the date of this Order, those records which detail the time entries of her attorney, and which relate to her claim for reasonable attorney's fees under the IDEA.

5. That the District's Motion to Clarify Court File Data Status [Docket No. 63] is GRANTED, and the Court directs that the Court's provisional sealing of this file, so as to protect the identity of S.D. and K.S., continue until further Order of the Court.

AND, It is—

RECOMMENDED:

1. That the Plaintiff's Motion for Judgment on the Record [Docket No. 14] be granted.

2. That S.D.'s Petition for Attorneys' Fees [Docket No. 4] be granted in an amount to be determined by the Court.

3. That the Defendant Commissioners' Motion to Dismiss [Docket No. 6] be granted.

4. That the Defendant K.S.'s Motion to Dismiss [Docket No. 13] be granted.

5. That the Defendant Commissioners' Motion to Dismiss S.D.'s Cross-claim [Docket No. 21] be denied as moot.[43]

6. That the Plaintiff's Motion to Dismiss the Counterclaim of S.D., J.D. and N.D., [Docket No. 29] be granted.

7. That the Defendant Commissioners' Motion to Dismiss the Amended Cross-claim of S.D., J.D. and N.D. [Docket No. 39] be granted.

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D.Minn. LR1.1(f), and D.Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than March 27, 1995, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than March 27, 1995, unless all interested parties stipulate that the District Court is not required by

---

**43.** This Motion was mooted by the filing of an Amended Cross-claim on November 24, 1993, and was renewed by the Defendant Commissioners' filing of an Amended Motion to Dismiss on December 29, 1993.

Title 28 U.S.C. § 636 to review the transcript in order to resolve all of the objections made.